Paul LAVERTY, Appellant
and Cross–Appellee,

v.

ALASKA RAILROAD CORPORATION, an Alaska Public Corporation, and Flamingo Brothers Partnership, an Alaska Partnership, Appellees and Cross–Appellants.

Nos. S-8951, 9071, 9081.

Supreme Court of Alaska.

Dec. 1, 2000.

726

Thomas E. Meacham, Anchorage, for Appellant/Cross–Appellee.

William R. Hupprich, Anchorage, for Appellee/Cross–Appellant Alaska Railroad Corporation.

Robert J. Sato, Middleton & Timme, P.C., Anchorage, for Appellee/Cross–Appellant Flamingo Brothers Partnership.

Before EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

Paul Laverty sued to block a contract allowing the Flamingo Brothers Partnership to extract gravel from Alaska Railroad Corporation (ARRC) land, alleging that the contract disposed of state land without prior public notice, in violation of the Alaska Constitution's Public Notice Clause. The superior court ruled that the constitution bars ARRC from disposing of its lands without public notice because they are "state lands" under the constitution. But the court denied declaratory relief, finding that the public received adequate notice through Flamingo Brothers' participation in the process of obtaining a conditional use permit to extract its gravel. The court also denied injunctive relief, finding that laches applied because Laverty failed to sue before Flamingo Brothers incurred substantial costs in the permitting process. Laverty appeals; ARRC and Flamingo Brothers cross-appeal. We affirm the court's decision on laches and its declaration that the Public Notice Clause applies to ARRC lands. But we reverse its finding on the issue of notice, holding that the permitting process failed to give adequate "prior" notice of the contract, as the constitution requires.

## II. FACTS AND PROCEEDINGS

The Government Hill neighborhood in the Municipality of Anchorage is home to an abandoned apartment complex, an ARRC rail yard, and valuable gravel deposits. Paul Laverty resides in Government Hill. He participated in a task force, chaired by an ARRC representative, that was to make recommendations regarding ways to redevelop the abandoned apartments. One option the task force considered was to offset the cost of

demolishing the apartments by selling gravel from the underlying property.

In October 1995, while the task force had the demolition/gravel-excavation plan under advisement, ARRC and Flamingo Brothers signed a four-year "license agreement" giving Flamingo Brothers the right to enter the nearby ARRC rail yard to extract 670,000 cubic yards of gravel, over a four-year period, in exchange for a royalty. Beginning in December 1995, Flamingo Brothers sought approval from the Municipality of Anchorage for a zoning change and a conditional use permit allowing gravel excavation on the ARRC parcel. The permitting process consumed more than a year, and Laverty participated in some of the permit hearings, opposing the application. The municipality nevertheless approved the new zoning and the conditional use permit in June 1997.

Laverty took other steps to block the contract. Between January 1 and February 2, 1996, he consulted a lawyer, appeared before the ARRC board, and wrote his state legislators. The lawyer told him that the ARRC/Flamingo Brothers contract probably violated article VIII, section 10 of the Alaska Constitution (the Public Notice Clause), which provides: "No disposals or leases of state lands, or interests therein, shall be made without prior public notice and other safeguards of the public interest as may be prescribed by law." The ARRC Board noted Laverty's comments but promised no action. The legislature initiated an audit. Ultimately, none of these actions led to recission of the contract.

On February 25, 1997, more than fifteen months after he learned that ARRC and Flamingo Brothers had signed the contract, Laverty filed his superior court action. He alleged that ARRC had violated the Public Notice Clause by disposing of an interest in state lands without prior public notice. Laverty sought an injunction blocking the contract as well as a declaration that it violated the Public Notice Clause.[1]

The parties filed cross-motions for summary judgment, which the superior court decided in February 1998. The court con-cluded that ARRC lands are state lands under the Public Notice Clause because of ARRC's "substantial and intimate connections to the state." Nevertheless, the court denied Laverty injunctive and declaratory relief. The court found that Laverty's claim for injunctive relief was barred by laches. It reasoned that even though Laverty was advised that he had a viable constitutional cause of action soon after the gravel contract was signed, he waited over a year to file suit. During that time, he tried to block the gravel contract by appearing before the ARRC board and by asking his legislators to look into the matter. At the same time, he participated in municipal hearings relating to the Flamingo Brothers' conditional use permit, knowing that the company had to pay for an expensive geotechnical study to win the municipality's approval. The court judged Laverty's delay to be unreasonable under the circumstances, and concluded that it unfairly prejudiced Flamingo Brothers.

The superior court also found that, although the Public Notice Clause applied to the gravel extension contract, Flamingo Brothers' participation in the land use permit application process gave the necessary constitutional notice. The court ruled that this notice occurred prior to the disposal of ARRC's interest in its lands because, in the court's view, obtaining the needed permits was a condition precedent to the transfer.

Based on these rulings, the superior court entered judgment in favor of ARRC and Flamingo Brothers, dismissing Laverty's complaint with prejudice. Although the court concluded that the defendants had prevailed in the litigation, it declined to award them attorney's fees, finding that Laverty was a public interest litigant.

On appeal, Laverty argues that the superior court erred in denying injunctive relief and in declining to enter a declaratory judgment. He also contends that, since he prevailed on his claim that the Public Notice Clause applies to ARRC lands, the court should have awarded him prevailing-party attorney's fees. On cross-appeal, ARRC and Flamingo Brothers contend that the superior

---

1. Laverty also alleged violations of ARRC's pro-curement rules, but he later dropped this claim.

court erred in declaring that the Public Notice Clause applies to ARRC lands; they also contend that the doctrine of laches should have precluded the court from declaring the law on this issue.

## III. DISCUSSION

### A. Laches

Laverty learned of the disputed contract shortly after it was signed in October 1995, knew of his constitutional cause of action against ARRC by January 1996, but failed to file suit until February 1997. Both ARRC and Flamingo Brothers raised the affirmative defense of laches against Laverty's claim. On summary judgment, the superior court applied laches to deny Laverty injunctive relief but concluded that the defense did not bar declaratory relief.

■ Whether laches bars a suit is a question properly addressed to the trial court's discretion; we will not overturn its decision unless our review of the record leaves us with a definite and firm conviction that a mistake has been committed.[2] To mount a laches defense, "the defendant must show, (1) that the plaintiff has unreasonably delayed in bringing the action, and (2) that this unreasonable delay has caused undue harm or prejudice to the defendant."[3]

■ The superior court ruled that laches barred Laverty's request for an injunction against performance of the gravel contract because Laverty knew, over the course of his one-year delay in bringing suit, that Flamingo Brothers was spending large amounts of time and money on geotechnical studies to support its land use permit applications. Relying on our decision in the similar case of City and Borough of Juneau v. Breck,[4] the superior court reasoned that the lost time and money caused by an injunction would unduly prejudice the Flamingo Brothers.

We see no valid reason to disturb this ruling. Laverty knew of his cause of action over a year before he brought it. While he made several ineffective attempts to resolve his grievances without litigation, they were exhausted more than four months before he brought suit, when a legislative audit report issued without affecting the contract. In the meantime, Laverty knew that Flamingo Brothers had undertaken an expensive rezoning and conditional use permit application process. In these circumstances, we are left with no definite and firm conviction that the superior court abused its discretion in applying laches as a defense to Laverty's request to enjoin performance of the gravel contract.

We must separately examine the superior court's further conclusion that laches did not bar Laverty's claim for declaratory relief. The court reached this conclusion because it found that declaring ARRC lands to be subject to the Public Notice Clause would not result in "any harm or prejudice to the defendants in this particular case."

Alaska's Declaratory Judgment Act gives courts the authority to declare rights without granting a separate legal or equitable remedy.

> In case of an actual controversy in the state, the superior court, upon the filing of an appropriate pleading, may declare the rights and legal relations of an interested party seeking the declaration, whether or not further relief is or could be sought. The declaration has the force and effect of a final judgment or decree and is reviewable as such. Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against an adverse party whose rights have been determined by the judgment.[5]

This provision requires declaratory judgment actions to be associated with an actual case or controversy; they do not open the door for hypothetical adjudications, advisory opinions, or answers to moot questions. Nevertheless, we have noted that "declaratory relief may be sought to determine the validity

---

**2.** See City and Borough of Juneau v. Breck, 706 P.2d 313, 315 (Alaska 1985) (quoting Moore v. State, 553 P.2d 8, 15 (Alaska 1976)).

**3.** Id.

**4.** Id.

**5.** AS 22.10.020(g). See also Jefferson v. Asplund, 458 P.2d 995, 996 (Alaska 1969).

and construction of statutes and public acts."[6]

Courts in other jurisdictions have described the declaratory judgment as a sui generis form of relief, arising neither at law nor at equity.[7] We have similarly described the Declaratory Judgment Act as adding "another remedy to existing legal and equitable remedies."[8] These characterizations cause a problem when the affirmative defense of laches is raised against a claim for declaratory relief, since laches is an equitable defense against equitable causes of action, but not a legal defense against actions at law.[9] Courts often resolve this problem by looking to the circumstances surrounding the claim and applying laches if the claim would have arisen in equity before declaratory judgment was available.[10]

Here, Laverty sought a declaration and a parallel injunction, which might lead courts in some jurisdictions to treat the declaration as equitable relief, subject to laches. In Alaska, however, the issue is complicated by the broad right of standing that our law confers on citizen-taxpayers. Unlike many jurisdictions, Alaska permits citizen-taxpayer standing when a case raises issues of "public significance" and the person bringing the case is an "appropriate" party to raise the issue. Our law thus recognizes that declaratory relief is often the simplest and most effective form of judgment in cases involving significant public interest brought pursuant to citizen-taxpayer standing.[11]

Laverty's claim that ARRC violates the Alaska Constitution when it disposes of its lands without prior public notice falls squarely within this category. But because Laverty simultaneously requested declaratory and injunctive relief, his interest in placing this important question before the courts potentially competes with the underlying interest promoted by the defense of laches—avoiding unfair prejudice that results from unreasonable delay. Courts should harmonize these competing interests when possible.[12] Accordingly, a finding that injunctive relief would be blocked by laches does not necessarily mean that an accompanying claim for declaratory relief should also be blocked. Rather, courts should independently examine each cause of action to determine whether laches should apply. In the present case, the superior court recognized this when it found that a declaration of ARRC's constitutional duty to notify the public before disposing of

6. *Jefferson*, 458 P.2d at 999.

7. See *Taft v. United States*, 824 F.Supp. 455, 466 n. 7 (D.Vt.1993); *Lacy v. Mid-Continent Cas. Co.*, 247 F.Supp. 667, 673 (S.D.Tex.1965); *Inland Steel Prods. Co. v. MPH Mfg. Corp.*, 25 F.R.D. 238, 242 (N.D.Ill.1959); *Cronin v. State Farm Fire & Cas. Co.*, 958 S.W.2d 583, 587 (Mo.App. 1997); *Main Street Movies v. Wellman*, 251 Neb. 367, 557 N.W.2d 641, 643 (1997); *Space Master Int'l, Inc. v. Porta-Kamp Mfg. Co.*, 794 S.W.2d 944, 947 (Tex.App.1990).

8. *Jefferson*, 458 P.2d at 997.

9. See *Hanson v. Kake Tribal Corp.*, 939 P.2d 1320, 1325 n. 1 (Alaska 1997).

10. See, e.g., *KLLM, Inc. Employee Health Protection Plan v. Ontario Community Hosp.*, 947 F.Supp. 262 (S.D.Miss.1996) (examining nature of underlying issues to determine how they would have arisen had Congress not enacted the Declaratory Judgment Act).

11. See *Baxley v. State*, 958 P.2d 422, 428 (Alaska 1998) (seeking declaration that act authorizing amendment of certain oil and gas leases violated Uniform Application Clause and Public Notice Clause of Alaska Constitution); *Trustees for Alaska v. State, Dep't of Natural Resources*, 736 P.2d 324, 326 (Alaska 1987) (seeking declaration that the state's mineral leasing system violated section of Alaska Statehood Act); *Gilman v. Martin*, 662 P.2d 120, 123 (Alaska 1983) ("Any resident or taxpayer of a municipality has a sufficient interest in the disposition of a significant number of acres of the municipality's land to seek a declaratory judgment as to the validity of the disposition.").

12. See *Lake and Peninsula Borough v. Local Boundary Comm'n*, 885 P.2d 1059, 1065 (Alaska 1994). In *Lake*, we upheld the trial court's refusal to apply laches against villages that sought injunctive and declaratory relief against incorporation of the Lake and Peninsula Borough. Although the suit was not for damages, we held that because the parties were " 'seeking to enforce a legal right, as opposed to invoking the discretionary equitable relief of the courts, the applicable statute of limitations should serve as the sole line of demarcation for the assertion of that right.' " *Id.* at 1064–65 (quoting *Kodiak Elec. Ass'n v. DeLaval Turbine, Inc.*, 694 P.2d 150, 157 (Alaska 1984)).

its land would not, by itself, prejudice the defendants.

The record supports this finding. Having raised the affirmative defense of laches, ARRC and Flamingo Brothers bore the burden of demonstrating that both elements of the defense—unreasonable delay and undue prejudice—weighed against issuing a declaratory judgment.[13] While Flamingo Brothers persuasively argued that an injunction barring performance of the disputed contract would cause serious prejudice, the company never specified how a bare declaration of ARRC's constitutional duty to comply with the Public Notice Clause—that is, a declaratory judgment addressing the constitutional issue but declining to enjoin contractual performance—would have exposed either party to harm in this case. Moreover, ARRC pursued the defense of laches only by joining in Flamingo Brothers' laches argument. Yet Flamingo Brothers' claim of prejudice addressed only Flamingo Brothers' own interests—the time and money the company had expended in the permitting process. Flamingo Brothers did not establish—or even claim—that entry of a judgment declaring ARRC's duty to comply with the Public Notice Clause would cause ARRC any prejudice. Since the record provides no basis for concluding that a declaratory judgment against ARRC would have unduly prejudiced ARRC's interests in this case, the superior court did not abuse its discretion in concluding that laches did not bar declaratory relief.

### B. *The Public Notice Clause*

Next we turn to ARRC's claim that its lands are not state lands subject to the Public Notice Clause. Because the Public Notice Clause prohibits disposal of "state lands, or interests therein, . . . without prior public notice,"[14] we must consider whether ARRC's lands are "state lands," whether the disputed contract for extraction of gravel amounts to a "disposal" of the land "or interests therein," and whether there was "prior public notice" of the disposal. In reviewing these questions of law, we apply our independent judgment.[15]

### 1. *ARRC's lands are state lands.*

■ ARRC argues that because the Alaska Railroad Corporation Act gives it "a legal existence independent of and separate from the state,"[16] its lands cannot be considered "state lands." But the same section of the Act that declares ARRC's independent and separate existence also makes ARRC "an instrumentality of the State within the Department of Commerce and Economic Development."[17] Given this language, as well as other provisions of the Act, we conclude that ARRC may not evade the strictures of the Public Notice Clause by "resorting to the corporate form."[18]

We find guidance in the United States Supreme Court's decision in a closely analogous case, *Lebron v. National Railroad Passenger Corp.*[19] In *Lebron*, the Court addressed the application of the United States Constitution to the National Passenger Rail Corporation (Amtrak). Lebron contended that Amtrak, as a government entity, violated his First Amendment rights by blocking his display of a politically-charged advertisement on Amtrak trains. Amtrak responded that it was not a government entity because Congress had given it independent corporate status. But the Court rejected this response, holding that, while Congress could give Amtrak independent corporate status in matters within Congress's control, it could not determine Amtrak's status as a government entity under the Constitution:

> If Amtrak is, by its very nature, what the Constitution regards as the Government, congressional pronouncement that it is not such can no more relieve it of its First Amendment restrictions than a similar

---

**13.** *See Winn v. Mannhalter,* 708 P.2d 444, 450 (Alaska 1985).

**14.** Alaska Const. art. VIII, § 10.

**15.** *See Laborers Local No. 942 v. Lampkin,* 956 P.2d 422, 429 n. 4 (Alaska 1998).

**16.** AS 42.40.010.

**17.** *Id.*

**18.** *Lebron v. National R.R. Passenger Corp.,* 513 U.S. 374, 397, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995).

**19.** *Id.*

pronouncement could exempt the Federal Bureau of Investigation from the Fourth Amendment. The Constitution constrains governmental action "by whatever instruments or in whatever modes that action may be taken."[20]

The Court thus concluded that Amtrak was bound to honor Lebron's First Amendment rights because, despite its Congressionally given independent status, it "is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution."[21]

The statutory basis and management structure of the Alaska Railroad Corporation parallels that of Amtrak as described by the Supreme Court. Both were created by special statute. Amtrak was created "explicitly for the furtherance of federal governmental goals;"[22] the ARRC was created for the "continued operation of the Alaska Railroad[,] [which is] an essential government function of the state."[23] Amtrak's board of directors consists of nine members, eight of whom are politically appointed.[24] ARRC's board of directors "consists of the commissioner of community and economic development, the commissioner of transportation and public facilities, and five members appointed by the governor."[25] As with Amtrak, a portion of the appointed members must be confirmed by the legislature.[26] And Alaska's control over ARRC's board is more pronounced than the federal government's control over Amtrak's, since ARRC directors

serve their five-year terms "at the pleasure of the governor."[27]

Like Amtrak, ARRC is not merely in the temporary control of Alaska, "as a private corporation whose stock comes into [state] ownership might be,"[28] but was created by the legislature to carry out the "essential government function" of operating the Alaska Railroad.[29] In its agreement with Flamingo Brothers the railroad refers to itself as a "governmental authority."[30] Finally, AS 42.40.940 provides that state ownership of the railroad may end only if "(1) it can be assured that the railroad will continue to operate after the sale or lease; and (2) under the terms of the sale or lease, the state will receive the amount of money it has spent in connection with the Alaska Railroad."[31] Such a sale is subject to approval by the legislature.[32] In the event the corporation is dissolved other than through such a sale, its assets revert to the state.[33]

ARRC nevertheless points to evidence that the legislature intended to grant it an unusual amount of independence. For example, under the Alaska Railroad Corporation Act, ARRC has the independent capacity to sue and be sued, independent management structure, exemption from many laws that apply to the other branches of the state, and an independent budget.

But these provisions grant independence from the state in matters that are within the legislature's control. ARRC does not explain

**20.** *Id.* at 392 (quoting *Ex parte Virginia,* 100 U.S. 339, 346–47, 25 L.Ed. 676 (1880)).

**21.** *Id.* at 394, 115 S.Ct. 961.

**22.** *Id.* at 397, 115 S.Ct. 961.

**23.** AS 42.40.010.

**24.** *See Lebron,* 513 U.S. at 397, 115 S.Ct. 961.

**25.** AS 42.40.020.

**26.** *See id.* (requiring that the five politically appointed members be "confirmed by a majority of the members of the legislature in joint session").

**27.** *Compare* AS 42.40.030 *with Lebron,* 513 U.S. at 398, 115 S.Ct. 961 ("It is true that the directors of Amtrak, unlike commissioners of independent regulatory agencies, are not, by the ex-

plicit terms of the statute, removable by the President for cause, and are not impeachable by Congress.").

**28.** *Lebron,* 513 U.S. at 398, 115 S.Ct. 961.

**29.** AS 42.40.010.

**30.** "Licensee . . . shall observe . . . all laws, ordinances, rules, and regulations which are now in effect or may later be adopted by any governmental authority, *including the Alaska Railroad Corporation . . . .*" (Emphasis added.)

**31.** AS 42.40.940.

**32.** *See id.*

**33.** AS 42.40.950.

how the legislative intent to confer independence in these matters exempts ARRC from burdens that originate in the constitution and that apply to it as an instrumentality of the state. Because the railroad remains, "by its very nature, what the Constitution considers to be government,"[34] we conclude that it must satisfy the constitutional restrictions imposed by the Public Notice Clause.

Contrary to ARRC's contention, this conclusion does not "render much of [the Alaska Railroad Corporation Act] superfluous." ARRC claims, for instance, that its exemption from the Alaska Land Act[35]—granted at AS 42.40.920(b)(11)—becomes meaningless if its lands are subject to the Public Notice Clause. But this exemption simply allows ARRC to develop its own procedures for complying with the Public Notice Clause, which need not mirror the rigorous procedural safeguards set out in the Alaska Lands Act.

■ ARRC insists, however, that the legislature has the power to declare that ARRC's lands are not "state lands," just as it legislated the status of ARRC's employees and debt: "[I]f the legislature has the authority to determine that ARRC employees are not 'state employees'[36] and that ARRC debts are not 'state debts,'[37] it certainly has the authority to determine that ARRC land is not 'state land.'" In asserting that the legislature defined its lands not to be state lands, ARRC directs us to several scattered sections of the Alaska Railroad Corporation Act. These include ARRC's exemption from the State Lands Act,[38] provisions authorizing ARRC to use "state land" adjacent to its rights of way in an emergency,[39] and provisions allowing municipalities or the state to request authorization for public use of railroad land.[40]

Yet the state's obligation to "state employees," its authority to incur "state debts," and its duty regarding disposal of "state lands" are regulated by separate constitutional provisions.[41] Hence, just because the legislature has authority to define ARRC employees as non-state employees and to preclude ARRC from incurring state debt, it hardly follows, as ARRC argues it does, that the legislature "certainly has the authority to determine that ARRC land is not 'state land.'"[42]

**34.** *Lebron,* 513 U.S. at 392, 115 S.Ct. 961.

**35.** AS 38.05.

**36.** *See* AS 42.40.710 ("Employees of the Alaska Railroad are employees of the corporation and not of the state. However, employees of the corporation shall be treated as employees of the state for the purposes of AS 39.52.").

**37.** AS 42.40.690 ("Credit of state not pledged") reads, in relevant part:

(a) The state and its political subdivisions are not liable for the debts of the corporation. Bonds issued under this chapter are payable solely from the revenue or assets of the corporation and do not constitute a
 (1) debt, liability, or obligation of the state or of a political subdivision of the state; or
 (2) pledge of the faith and credit of the state or of a political subdivision of the state.
(b) The corporation may not pledge the credit or the taxing power of the state or its political subdivisions. Each bond issued under this chapter shall contain on its face a statement that
 (1) the corporation is not obligated to pay it or the interest on it except from the revenue or assets pledged for it; and
 (2) neither the faith and credit nor the taxing power of the state or of a political subdi-

vision of the state is pledged to the payment of it.

**38.** . *See* AS 42.40.920(b)(11).

**39.** *See* AS 42.40.380.

**40.** *See* AS 42.40.420.

**41.** *See* Alaska Const. art. XII, § 6 ("The legislature shall establish a system under which the merit principle will govern the employment of persons by the State."); art. VIII, § 10 ("No disposals or leases of state lands, or interests therein, shall be made without prior public notice and other safeguards of the public interest as may be prescribed by law."); and art. IX, § 8 (allowing state debt to be incurred only when "authorized by law for capital improvements ... and ratified by a majority of the qualified voters of the State who vote on the question").

**42.** Notably, the Alaska Constitution generally prohibits incurring state debt. *See* Alaska Const. art. IX, § 8; *cf. DeArmond v. Alaska State Dev. Corp.,* 376 P.2d 717, 722 (Alaska 1962). And the legislature had little choice but to exclude ARRC employees from the state's employment system at ARRC's inception, since the Federal Railroad Transfer Act guaranteed Alaska Railroad's federal employees the rights they held as federal em-

Moreover, unlike the Act's explicit provisions dealing with "state employee" and "state debt,"[43] ARRC's proposed definition of "state lands" would have to be gleaned by implication from various non-definitional provisions. We decline to recognize by implication a Public Notice Clause exemption for all of ARRC's holdings.

As further proof that its lands are not state lands, ARRC seeks to invoke "a series of Alaska Supreme Court decisions that support ARRC's contention that the term 'state' as used in the Alaska Constitution does not include public corporations such as ARRC." But the cases cited by ARRC are readily distinguishable: each concerns either an action by a public corporation that we determined was constitutionally permissible—regardless of corporate status[44]—or a public corporation's authority to exercise a government power or immunity that the legislature had denied it.[45] None of these cases relates to a government corporation's power to take action that would be constitutionally impermissible by the state. Our precedent thus fits into the *Lebron* framework: public corporations, particularly those significantly controlled by the state, must meet constitutional mandates, but may be regulated by statute separately from other government entities.

Next, ARRC argues that the Alaska Department of Natural Resources (DNR) does not consider ARRC's lands to be state lands. ARRC builds this argument on AS 38.04.060, which requires the Commissioner of DNR to compile and maintain an inventory of "all state land." Because DNR does not list ARRC's land on this inventory, ARRC reasons that the lands must not be state lands. ARRC urges us to defer to DNR's determination.

But the question at hand is whether ARRC lands come under the constitutional, not the statutory, meaning of "state lands." Since DNR has no expertise in determining constitutional meaning or authority to do so, we see no ground for deference.[46] Moreover, the record fails to establish that omission of ARRC lands from the statutory inventory actually signals the state's belief that those lands are not "state lands" for purposes of the Public Notice Clause. An affidavit of a DNR Section Chief explicitly disavows any such implication. And as Laverty frequently notes, the Alaska Attorney General has issued an Informal Opinion declaring that ARRC must provide prior notice before disposing of its lands.[47]

Finally, ARRC contends that its lands cannot be state lands because the federal government conveyed them directly to ARRC, and ARRC holds title to them in its own name. But the Alaska Railroad Transfer Act shows just the opposite, establishing that Congress transferred railroad ownership to Alaska in a way that made federal railroad lands state lands. The Act gave the Secretary of Transportation authority to "transfer all rail properties of the Alaska Railroad to the State,"[48] defining "State" to mean, "the State of Alaska or the State-owned railroad as the context requires."[49] In essence, then, the transaction was a federal-to-state grant: the federal government gave Alaska all of the

ployees for two years after the railroad's transfer to ARRC. *See* 45 U.S.C. § 1206 (1994).

43. *See* AS 42.40.690, .710.

44. *See Walker v. Alaska State Mortgage Ass'n*, 416 P.2d 245, 253 (Alaska 1966); *DeArmond*, 376 P.2d at 719–20.

45. *See City of Nome v. Block No. H, Lots 5, 6 & 7*, 502 P.2d 124, 125 (Alaska 1972); *Bridges v. Alaska State Hous. Auth.*, 349 P.2d 149 (Alaska 1959).

46. *See, e.g., Carr-Gottstein Properties v. State*, 899 P.2d 136, 139–40 (Alaska 1995) (courts defer to agency decisions involving agency expertise).

47. *See Cissna v. Stout*, 931 P.2d 363, 368 (Alaska 1996) ("While opinions of the attorney general are entitled to some deference, they are not controlling on matters of statutory interpretation.").

48. 45 U.S.C. § 1203 (1994).

49. 45 U.S.C. § 1202(13) (1994). The Act further defines "State-owned railroad" to mean "the authority, agency, corporation or other entity which the State of Alaska designates or contracts with to own, operate or manage the rail properties of the Alaska Railroad or, as the context requires, the railroad owned, operated, or managed by such authority, agency, corporation, or other entity." *Id.* at § 1202(14).

federal railroad's lands, allowing the state to designate the form of the state entity that would receive them. The way the state chose to take title, hold, and manage those lands is immaterial to whether they are governed by the Alaska Constitution's mandate.

In short, the superior court correctly ruled that, "[w]hile ARRC enjoys a considerable degree of autonomy in running the railroad and managing its assets, its substantial and intimate connections to the state ultimately make ARRC lands 'state lands' for the purposes of [the Public Notice Clause]."

### 2. *The gravel contract disposed of an interest in land.*

ARRC argued below and argues here that "the ARRC/Flamingo license does not constitute a disposal of an interest in land within the scope of Section 10." Whether the Flamingo Brothers' gravel contract disposed of an interest in land depends on the terms of the agreement. The relevant language of the contract reads:

> In consideration of the payment of royalties as set forth in paragraph 4 below, ARRC grants to Licensee [Flamingo Brothers] the exclusive right and privilege, at any and all times during the term of this agreement, to enter upon, produce, excavate, screen and remove gravel from all or any part of that certain real estate situated in the Anchorage Recording District, Third Judicial District, State of Alaska, shown highlighted in yellow on the attached Exhibit A (the "Property"). ARRC shall provide reasonable access to the Property from existing public areas.

The contract goes on to say:

> ARRC further grants to Licensee the right to use all or any portion of the Property for the purpose of erecting any and all equipment that may be used by Licensee

in the production of gravel, and the right to grade roads or trails to any and all points on the Property necessary or useful in the production of gravel from the Property. Licensee shall not, however, stockpile product on the Property other than temporarily.

■ Although the gravel contract declares itself a "License Agreement," these terms do not describe a license, but a form of easement. The Restatement of Property (First) describes a license as denoting

> an interest in land in the possession of another which

> (a) entitles the owner of the interest to a use of the land, and

> (b) arises from the consent of the one whose interest in the land used is affected thereby, and

> (c) is not incident to an estate in the land, and

> (d) is *not an easement*.[50]

The distinction between an easement and a license is best explained by the Restatement's illustrations:

> *Illustrations:*

> . . . .

> 2. A, the owner and possessor of Whiteacre, gives to B the privilege of entering upon Whiteacre and taking as much coal as B needs for his smelter located on Blackacre as long as the smelter remains in operation. The privilege of removing the coal is an easement[51] and is not a license.

> 3. A, the owner and possessor of White-acre, sells to B a car of coal already mined and standing on Whiteacre, which is owned and possessed by A. If there is an effective sale of the coal, B has a license

---

**50.** Restatement (First) of Property: Servitudes § 512 (1944) (emphasis added).

**51.** Specifically a "profit." *See* Restatement (Third) of Property: Servitudes § 1.2 (2000). Where an interest in land entitles the holder to take something from the land, it is accurately described as a "profit," which the Restatement (Third) of Property would reintroduce into the Restatement:

> A profit à prendre is an easement that confers the right to enter and remove timber, minerals, oil, gas, game, or other substances from land in the possession of another. It is referred to as a "profit" in this Restatement.

Restatement (Third) of Property: Servitudes § 1.2 (2000).

coupled with an interest to go on White-acre to remove the coal.[52]

Because the agreement in this case gave Flamingo Brothers the privilege of entering upon ARRC's land and mining gravel, it is a kind of easement, specifically a "profit."[53] The distinction between a license and a profit is important because this court's precedent suggests that a mere license ordinarily may not be an interest in land sufficient to trigger the Public Notice Clause.[54] ARRC champions a different view of the contract, suggesting that it might be characterized as a brokerage agreement. ARRC draws this suggestion from the legislative audit which described the contract as follows:

> This contract appears similar to a broker/client relationship. Through the contract, ARRC, in substance, has hired a broker to find a market for the railroad's gravel and then extract it and transport it to the buyer; [Flamingo Brothers] is simply a conduit between ARRC and the buyers. Such an agency relationship cannot, in our opinion, be construed to be a "*disposal of real property*," as stated above.[55]

But the auditor gave this description as part of a broader statement alleging that ARRC had improperly circumvented its procurement rules.[56] In responding to the auditor's draft report, ARRC advanced a very different argument from the one it offers here. Defending its decision to bypass its procurement rules in agreeing to the Flamingo Brothers' contract, ARRC insisted, "we

continue to believe a credible argument can be made that a contract *appurtenant* to a disposal of real property comes within the [procurement rule] exemption."

■ ARRC cannot have it both ways: either it disposed of real property and was not subject to procurement rules, as it claimed when it dealt with the auditor, or it violated its own procurement rules by arranging this contract. Since ARRC acknowledged to the auditor that it structured the Flamingo Brothers' contract as a land disposal to avoid its procurement rules, it cannot plausibly claim here, as a theory for exempting itself from the constitutional standard for disposing of land, that all it did was procure gravel brokerage services.

■ ARRC additionally maintains that, by authorizing certain negotiated sales of gravel without "advertisement" under AS 38.05.115, the legislature has effectively determined that the sale of gravel is not a disposal of an interest in land. This argument fails because AS 38.05.115 would have no application to the Flamingo Brothers' contract. The statute, which deals with disposal of timber and "other materials," does permit the Commissioner of DNR to negotiate certain contracts without advertisement,[57] but, with respect to "other materials," limits the commissioner's negotiating authority to contracts involving 25,000 cubic yards per year—a far smaller quantity than the four-year, 670,000 cubic-yard Flamingo Brothers' contract.[58]

---

**52.** Restatement (First) of Property: Servitudes § 513 (1944).

**53.** *See supra* note 51.

**54.** *Compare, e.g., Mertz v. J.M. Covington Corp.*, 470 P.2d 532, 535 (Alaska 1970) ("It is an almost universal rule of law today that a license is not an interest in real property within the terms of the statute of frauds relating to the transfer of interests in real property."); *with Northern Alaska Envtl. Ctr. v. State, Dep't of Natural Resources*, 2 P.3d 629, 634 (Alaska 2000) (holding that "grants of rights-of-way or easements for electric utility lines are disposals of an interest of land under AS 38.05.035(e) subject to the best interest finding requirement").

**55.** Randy S. Welker, Legislative Budget & Audit Comm., Dep't of Commerce & Econ. Dev., Alas-

ka Railroad Corp., Anchorage Gravel Activities, Audit Control No. 08–4547–96, at 10 (1996) (footnotes omitted).

**56.** ARRC Procurement Rule 2000.1(4) declares that those rules "apply to every expenditure of ARRC funds ... except that these rules do not apply to ... acquisitions or disposals of real property or an interest in real property...."

**57.** AS 38.05.115.

**58.** AS 38.05.115(a) provides, in relevant part:

> The commissioner shall determine the timber and other materials to be sold, and the limitations, conditions and terms of sale. The limitations, conditions and terms shall include the utilization, development and maintenance of the sustained yield principle, subject to preference among other beneficial uses. The com-

3. *The municipal permitting process did not provide "prior public notice" of the Flamingo Brothers' contract.*

 Although the superior court declared that the Public Notice Clause applied to the Flamingo Brothers' contract because the contract disposed of an interest in state lands, the court found that the public received adequate constitutional notice through the extensive notice that accompanied the Flamingo Brothers' application for a zoning change and conditional use permit. Relying on this finding, the superior court dismissed Laverty's suit and declined to enter a declaratory judgment in his favor. On appeal Laverty argues that, because the permitting process occurred after Flamingo Brothers acquired ARRC's interest, the process could not have satisfied the constitution's demand that the public receive notice "prior" to disposal.

This argument's validity turns on whether Flamingo Brothers acquired ARRC's interest when the contract was inked or when the conditional use permit was issued. The superior court found the latter, reasoning that obtaining a permit was a condition precedent of the Flamingo Brothers' contract. But the terms of the contract belie this conclusion. The first paragraph of the contract reads:

> In consideration of the payment of royalties ... ARRC grants to [Flamingo Brothers] the exclusive right and privilege, at any and all times during the term of this agreement, to enter upon, produce, excavate, screen and remove gravel from all or any part of that certain real estate situated in the Anchorage Recording District, Third Judicial District, State of Alaska, shown highlighted in yellow on the attached Exhibit A (the "Property"). ARRC shall provide reasonable access to the Property from existing public areas.

The contract's fifth paragraph declares that the "term of this agreement shall be four (4) years, beginning as of October 12, 1995." Thus, the language of the contract indicates that Flamingo Brothers had the right to enter onto the ARRC property to prepare for its operations immediately. Indeed, the company had to do so in order to complete geotechnical studies required by the permitting process.

While the contract did oblige Flamingo Brothers to obtain all necessary and desirable permits, it did not make the transfer of ARRC's interest in the gravel contingent on their issuance:

> 15. *Observance of Laws.* Licensee, at all times during the term of this agreement, at its own expense, and with all due diligence, shall observe and comply with all laws, ordinances, rules, and regulations which are now in effect or may later be adopted by any governmental authority, including the Alaska Railroad Corporation, and which may be applicable to the Licensee's use or occupancy of the Property or of any improvement on the Property. Without limiting the generality of the foregoing, Licensee shall obtain, at its sole expense, any conditional use permit (which permit will be held in the name of the Licensee), rezoning, replatting, or other governmental approvals required or desired as a result of its proposed operations.

This provision literally required Flamingo Brothers to obtain its conditional use permit "during the term of this agreement," not as a condition precedent thereto. The contract thereby placed the risk of failing to secure necessary permits on the party holding the property right—Flamingo Brothers. In so doing, it necessarily recognized that ARRC's property interest passed to Flamingo Brothers upon execution. Indeed, ARRC fails to explain how Flamingo Brothers could have

missioner may negotiate sales of timber or materials without advertisement and on the limitations, conditions, and terms that are considered to be in the best interests of the state. Within a one-year period, the commissioner may not negotiate a sale without advertisement to the same purchaser of

. . . .

(2) except as provided in (3) of this section, more than 25,000 cubic yards of materials[.]

We note, moreover, that this statute speaks of "advertisement," not public notice. For AS 38.05.115 to support ARRC's argument, ARRC would have to establish that, by allowing certain timber and material sales without advertisement, the legislature intended to exempt DNR from giving prior public notice of those sales. Here, ARRC has not shown that DNR fails to provide constitutional notice when it negotiates sales under AS 38.05.115.

obtained a conditional use permit in its own name, as required by Paragraph 15, without holding a legal interest in the property for which the conditional use permit would be granted.

Based on the terms of the contract, we conclude that ARRC transferred its interest to Flamingo Brothers upon signing. Thus, assuming that the permitting process otherwise sufficed as public notice of the contract, it failed to satisfy the Public Notice Clause's requirement that notice occur prior to, not after, disposal of the state's property interest.

### C. Attorney's Fees

 Laverty appeals the superior court's decision denying him attorney's fees. Although a trial court's award of attorney's fees is discretionary and will be overturned only for an abuse of discretion,[59] our decision reversing the court's ruling on issue of notice requires a remand for entry of a declaratory judgment for Laverty and against ARRC. Accordingly, the superior court will need to revisit the issue of attorney's fees on remand.[60] We agree with the superior court that Laverty qualifies as a public interest litigant; barring exceptional circumstances, he will therefore be entitled to an award of full reasonable fees against ARRC upon entry of judgment in his favor.[61]

### IV. CONCLUSION

The superior court's decision to bar injunctive relief under the doctrine of laches is AFFIRMED, as is the court's declaration that the Alaska Railroad Corporation is subject to article VIII, section 10 of the Alaska Constitution. The court's finding that the land use permitting process served as adequate prior public notice is REVERSED. Accordingly, we VACATE the order dismissing Laverty's complaint and REMAND this case for entry of a declaratory judgment in

Laverty's favor, and for reconsideration of the attorney's fees issue.

MATTHEWS, Chief Justice, not participating.

---

59. See Municipality of Anchorage v. Baugh Constr. and Eng'g Co., 722 P.2d 919, 929 (Alaska 1986).

60. See Tenala, Ltd. v. Fowler, 921 P.2d 1114, 1124 (Alaska 1996).

61. See Hunsicker v. Thompson, 717 P.2d 358, 359 (Alaska 1986); Dansereau v. Ulmer, 955 P.2d 916, 919 (Alaska 1998).