*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| NUNAMTA AULUKESTAI; RICKY DELKITTIE, SR.; VIOLET WILLSON; VICTOR FISCHER; and BELLA HAMMOND, | Supreme Court Nos. S-14560/14579 |
| | Superior Court No. 3AN-09-09173 CI |
| Appellants and Cross-Appellees, | O P I N I O N |
| v. | No. 7011 – May 29, 2015 |
| STATE OF ALASKA, DEPARTMENT OF NATURAL RESOURCES, | |
| Appellee and Cross-Appellant, | |
| v. | |
| PEBBLE LIMITED PARTNERSHIP, acting through its General Partner, PEBBLE MINES CORPORATION, | |
| Intervenor-Appellee. | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Nancy S. Wainwright, Victoria Clark, Stephen E. Cotton, Trustees for Alaska, Anchorage, for Appellants and Cross-Appellees. Laura Fox, Assistant Attorney General, Anchorage, and Michael C. Geraghty,

Attorney General, Juneau, for Appellee and Cross-Appellant. Matthew Singer and Howard S. Trickey, Jermain, Dunnagan & Owens, P.C., Anchorage, for Intervenor-Appellee. J. P. Tangen, Attorney at Law (P.C.), Anchorage, and Lawrence V. Albert, Anchorage, for Amicus Curiae Alaska Miners Association.

Before: Winfree, Maassen, and Bolger, Justices, Matthews and Eastaugh, Senior Justices.[*] [Fabe, Chief Justice, and Stowers, Justice, not participating.]

MATTHEWS, Senior Justice.
WINFREE, Justice, concurring.

## I.    INTRODUCTION

Challenged in this case are land and water use permits allowing intensive mineral exploration on State land. The main question we address is whether the Department of Natural Resources (DNR) had to give public notice before issuing the permits. Because the Alaska Constitution requires public notice when interests in land are transferred, the answer to this question depends on whether the permits conveyed an interest in land. After a trial, the superior court held that notice was not required because the permits were nominally and functionally revocable and therefore did not transfer an interest in land. We conclude that the land use permits were not functionally revocable. Because we therefore conclude that they conveyed an interest in land and consequently should have been preceded by public notice, we reverse the judgment of the superior court and remand.

---

[*]    Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

## II. FACTS AND PROCEEDINGS

### A. The Setting

The Pebble ore deposit lies north of Lake Iliamna. It consists of copper, gold, and other minerals and covers an area of about 360 square miles. The ore deposit sits astride the watersheds of the Kvichak and Nushagak Rivers, which flow into Bristol Bay. Bristol Bay is home to the world's largest wild sockeye salmon fishery. The average annual run of this high value species during 1990-2010 was about 37.5 million fish of which about 25.8 million were caught for commercial purposes.[1] The majority of the production of Bristol Bay sockeye comes from the Kvichak and Nushagak River watersheds.

The waters flowing into Bristol Bay host all five species of Pacific salmon as well as trout, char, and grayling. The sportfisheries for king salmon and rainbow trout in the Bristol Bay watershed are world renowned. Additionally Bristol Bay salmon form the centerpiece of the subsistence activities of the residents of this region. The area of the ore deposit also provides important habitat for land-based wildlife, providing winter and calving habitat for the Mulchatna caribou herd, "essential stream concentration" for brown bears, and moose habitat.

### B. Exploration Activities

The Pebble ore deposit was discovered in the late 1980s. The mineral claims to the deposit were secured by discovery, location, and filing. They are now owned by Pebble Limited Partnership ("PLP"). Exploration of the deposit has continued since 1988 and has escalated over the years. Exploration has primarily been conducted by exploratory drilling. As of 2010, when the trial in this case took place, some 1,269

---

[1] PAUL SALOMONE ET AL., 2010 BRISTOL BAY AREA ANNUAL MANAGEMENT REPORT, 85, 100 (Apr. 2011), *available at* www.adfg.alaska.gov/FedAidpdfs/FMR11-23.pdf.

bore holes had been drilled.  In addition, extensive seismic studies had been conducted using explosives along seismic lines.  PLP and its predecessors had expended over $300 million on exploration.

In the years immediately before the trial, the exploration program was supported by helicopters.  Drilling was conducted using portable rigs that were flown to each drill site.  Several sites might operate at one time.  The drill rigs were placed on wood decking or tundra mats.  Between one and three sump pits were dug for the settlement of the slurry of drilling mud and drilling waste that was discharged from the bore hole.[2]  Water for drilling was obtained from nearby sources.  When drilling was completed at each site, bore holes were generally plugged with concrete and the rigs and drill pads were removed by helicopter.  The sump holes were covered up using the original overburden and re-seeded if necessary.  Concrete plugs remained in all drill holes, and metal casings were left in some drill holes as well.  Some bore holes containing water that might be useful for future operations were merely capped, rather than plugged.

Since 1989 DNR has issued a series of permits for exploration activity in the area, with the area encompassed in the permits and the number of claims increasing over the years.[3]  The permits were "Miscellaneous Land Use Permits," abbreviated as

---

[2]     This describes best practices.  There is evidence that at times PLP and its predecessors simply allowed the discharged material to flow onto the tundra or into tundra ponds.

[3]     Nunamta alleged, and DNR admitted, that no permits issued for 2000 or 2001 and that PLP's predecessors filed Affidavits of Annual Labor, showing that they engaged in some mining activities, for those years; Nunamta and DNR dispute the significance of this fact.

"MLUPs."[4] Until 2007 PLP's predecessor mining companies took any needed water out of nearby streams, ponds, or bore holes to support their drilling operations without a separate water use permit.[5] PLP first applied for a water use permit in late 2006 for its 2007 activities; the Department issued water use permits for five-year periods. These permits were "Temporary Water Use Permits," or "TWUPs." The MLUPs and the TWUPs were issued for specific terms, but they also provided that they were revocable at will.

Although the exploration has been authorized incrementally, some facilities associated with the exploration have remained in place over many years. There is a supply depot and staging area occupying an area of about 30 meters by 300 to 350 meters. This consists of plywood sheds, wall tents, and mats for storing material, interconnected by wooden walkways. All the buildings are capable of being disassembled and removed by helicopter.

There is a fueling station at a lake where float planes can land and transfer fuel to tanks. The stored fuel is used to refuel helicopters, but it is also transported to drill sites by helicopter for use at the sites. At the fueling station there are a dock, two helicopter landing pads, five large fuel tanks in an aluminum containment structure, tundra mats, and a temporary shelter building. At a different location there is a separate storage area, used primarily for storage of hoses and fuel containment structures, which consists of several plywood sheds, wall tents, and tundra mats.

---

[4] Permits from 1992 and 1993 are called "Exploration and Reclamation Permits," but we see no significant difference between these permits and those labeled "Miscellaneous Land Use Permits."

[5] Some applications filed before 2007 included information about estimated water usage needs.

The workers on the exploration project are not housed there. Instead they are flown in daily from a village some 17 miles away. As the trial court stated:

> There are no roads or wheeled vehicles as it is an entirely helicopter-supported program. There is no permanent airstrip, no residential camp facilities, no four-wheel trails, no sewage lagoon, no water treatment plant, no bridges and no obstructions to any water body. All of the structures found at Pebble are temporary and can be deconstructed and removed by helicopter. (Citations omitted.)

## C.    The 2009 MLUP

The most recent MLUP as of the time of trial provides that "[e]ffective dates of this permit shall be February 26, 2009 through December 31, 2010, unless sooner revoked for cause. This permit is also revo[c]able at will." It states that it is "for activities upon State managed lands described in the Hardrock Exploration Application" submitted by PLP.

The activities described in the application, and thus permitted by the MLUP, included 100 diamond-core drilling bore holes that could be as deep as 7,000 feet and have a diameter of up to 6 inches. Also permitted were 325 bore holes drilled with mud-rotary and reverse-circulation drills into bedrock to depths of from 10 to 500 feet.

The permit also allowed shooting 34 seismic blast lines totaling a maximum of 220,000 feet. Along the seismic lines, between 500 and 925 pounds of dynamite could be exploded in approximately 1,100 shots. Each shot will excavate a hole from 2 to 12 feet in diameter and 2 to 3 feet deep. After the permit expires these blast holes will still be present although they will be smoothed and revegetated.[6]

---

[6]    The plan states:

Each shot hole will be smoothed and rounded by hand shovel and rake. Where possible, covering vegetation will be cut out and removed prior to the blast and subsequently rolled back

(continued...)

The permit also allowed activities in anticipation of the yet to be reached mine development phase. It allowed 320 shallow soils test pits "to determine soil horizons for construction purposes." These pits could be approximately four feet wide, seven feet long, and up to seven feet deep. Once the sampling process terminated, they would be backfilled, the overburden would be put back in place, and re-seeding would be performed if necessary.

Concerning the facilities that have spanned a number of permit periods, the application stated that the storage camp built in 2004 continued to be used but that certain plywood sheds were removed and replaced with a 24-foot by 60-foot WeatherPort tent. That plus one remaining 10-foot by 20-foot wooden structure were the only buildings at this location. At a separate location two structures had "been erected to protect water hose[s] and keep them from freezing." One was a 10-foot by 20-foot metal-clad building and the other is a 15-foot by 36-foot WeatherPort tent. The application noted that "[a]ll are temporary and will be removed when no longer needed."

Finally, the application noted that PLP had TWUPs allowing the use of water from streams, ponds, and previous drill holes for up to 16,200 gallons per day or 113,400 gallons per week "per rig." PLP's plan of operation called for up to 12 rigs to be on site.

### D. Proceedings

Nunamta Aulukestai, an association of eight Native village corporations in the Bristol Bay region, and two individuals who reside in Nondalton, Jack Hobson and Ricky Delkittie, Sr. (collectively "Nunamta"), appealed the issuance of the MLUP for

---

[6](...continued)
over the site when reclaimed. The disturbed surface will be reseeded with native vegetation. As the program will be helicopter supported, no ground footprint will be left other than the blast hole.

the Pebble project for 2009-10. The appeal was brought in March 2009, and was directed to the DNR Commissioner. It challenged, among other things, the lack of public notice prior to issuing the permit, DNR's failure to address the cumulative impacts of the proposed exploration activities, and the lack of specific information concerning both the sources of water and the nature of the materials to be used for plugging drill holes. When DNR denied Nunamta's request to stay the permit, Nunamta, in July of 2009, filed a complaint for declaratory judgment in the superior court.[7] This complaint forms the basis for the present appeal, and we will describe it below, after we describe the course of the administrative appeal.

In the administrative appeal, in November 2009 DNR denied the appeal on the ground Nunamta did not have standing. But DNR also stated that it had considered all the legal and factual grounds presented by Nunamta and indicated that it would have denied the appeal on the merits as well. DNR issued this decision without first holding an evidentiary hearing or calling for or receiving briefing on any issues.

Nunamta appealed DNR's decision to the superior court, challenging its rulings on due process grounds. In October 2011 Judge Michael Spaan ruled that DNR had violated Nunamta's due process rights by rejecting the appeal on standing grounds without offering Nunamta the opportunity to cure the alleged standing deficiency. But the court also ruled that any harm from this action was cured because DNR had rendered a decision on the merits and Nunamta had no other valid due process claims. Nunamta appealed this ruling to this court. After the case was briefed and orally argued, we asked for supplemental briefing as to why the appeal should not be dismissed as moot in light

_____

[7]     Nunamta was joined by four individuals as plaintiffs in the declaratory judgment action: Ricky Delkittie, Sr. of Nondalton; Violet Willson of Naknek; Victor Fischer of Anchorage; and Bella Hammond of Lake Clark. For convenience we also collectively refer to these plaintiffs as "Nunamta," while recognizing that not all of the individual parties were involved in both cases.

of the expiration of the permit at issue and because the pertinent issues were raised or could be raised in the declaratory judgment action. After considering the supplemental briefing, we entered an order dismissing the administrative appeal as moot without additional explanation.

We now turn to the proceedings in Nunamta's declaratory judgment action. The complaint contained six counts, each of which generally alleged that the statewide permitting process for hardrock mines is constitutionally deficient and also specifically alleged that the permitting process related to the Pebble exploration is deficient in the same way. In particular:

• Count I claimed that DNR, by granting permits for exploration and "water use without analysis or findings addressing the direct, indirect and cumulative impacts of [mining exploration] uses on the public domain, has failed to fulfill its fiduciary public trust duty to manage state resources for the common good."

• Count II claimed that the issuance of exploration and water use permits without analysis as to their effect on "reasonable concurrent users of public land, water, fish and wildlife, cultural resources and subsistence resources" violates article VIII, sections 1, 2, and 8 of the Alaska Constitution.

• Count III claimed that DNR violated article VIII, sections 3 and 4 of the Alaska Constitution relating to the reservation of fish, wildlife, and waters to the people for common use subject to preferences among beneficial users, by issuing the permits with no analysis and thus elevating mining to the highest preference without justification.

• Count IV claimed that the exploration and water use permits issued by DNR "are *de facto* disposals of interests in state land and water requiring public notice and other safeguards of the public interest" in violation of article VIII, section 10 of the Alaska Constitution.

• Count V alleged that DNR violated article VIII, section 13 of the Alaska Constitution relating to the reservation of water to the people for common use by permitting the use of significant amounts of water for "at least five years or longer" with "no public notice or analysis of the impacts of that water use on beneficial and concurrent uses."

• Count VI alleged a violation of article VIII, section 17 of the Alaska Constitution — the Uniform Application Clause — claiming upland hardrock mining exploration permits were issued without public notice and without a public interest review whereas offshore mining exploration permits can only be issued after notice is given and a best interest analysis is conducted. In addition, this count challenged as irrational the statutory and regulatory water use system that allows significant water use labeled "temporary" without public notice or a public interest review whereas withdrawals deemed "permanent" must be accompanied by such protections.

PLP intervened as a defendant. The State and PLP filed motions for summary judgment on all six counts. The superior court, Judge Eric A. Aarseth presiding, granted these motions as to Count VI relating to the Uniform Application Clause, ruling that section 17 serves only to protect similarly situated *users* from unequal application of laws and regulations, whereas Nunamta's claim focused not on users but particular *uses* of the public lands.

As to Nunamta's other claims, the court ruled that they could not be considered generally, but could be considered to be "as applied" challenges to the statutes and regulations under which the exploration permits were issued. The court collectively summarized the remaining counts as claiming "that the State should have performed a best-interest finding before granting the permits at issue and should have made that finding available to the public."

The court stated:

As the State notes, the constitution does not mention a best-interest finding, and one is not specifically required by the language of the various natural resource provisions. Instead, a best-interest finding is an artifact of the State's consideration of constitutional policies of maximum beneficial use, sustained yield, concurrent uses, etc. All of these considerations, in turn, are expressions of the same underlying constitutional policy "to encourage the settlement of [public] land and developments of [the State's] resources by making them available for maximum use consistent with the public interest." Because these intertwined constitutional considerations are encompassed by a single finding, the ultimate question here is whether the State should have made such a finding before issuing permits to the Pebble Project, or whether (as the State alleges) it was only required to adhere to its own statutory and regulatory limitations and authorizations.

The court, at least provisionally, rejected the State's argument that the provisions of article VIII did not impose any protections independent of those specifically imposed by the legislature:

> [P]rovisions of Article VIII, in order to have any meaning at all, must be interpreted as containing independent constraints on State action. As noted above, however, because the main dispute in this case is whether the State should have considered the content of any of these constitutional provisions before issuing the MLUPs and TWUPs, the Court need not consider the application of these provisions on a count by count basis. The State either needed to balance the policy considerations entrenched in Article VIII or it did not.

The court concluded that there were material issues of fact regarding Nunamta's remaining claims that the State did not comply with the provisions of article VIII, writing, "Whether these permits themselves are disposals, and whether the nature of the land use triggers constitutional considerations requires an examination of the underlying activities."

Both the State and PLP moved for reconsideration of the court's order on summary judgment. They argued that only questions of law were presented and that requiring a trial would have the effect of creating an ambiguous and unworkable process for issuing exploration permits. The superior court denied these motions and later defined the issues for trial in an Order On Rule of Law as follows:

> At trial, the court will consider:
>
> 1)      Whether the permits issued for mineral exploration at the Pebble Project are functionally irrevocable[1] and amount to a "disposal" under Art. VIII, Section 10.
>
> 2)      Whether, if the permits amount to a "disposal," the State provided constitutionally adequate prior public notice of the disposal under Art. VIII, Section 10, and
>
> 3)      Whether the exploration permits and the associate[d] mining exploration activity unconstitutionally impinged on reasonable concurrent uses under Art. VIII, Section 8.
>
> The common theme in Counts I, II, III and V in Plaintiffs' Complaint is that permits are subject to restrictions based on reasonable concurrent uses.[2]
>
> The court will receive testimony and evidence as it relates to the revocable nature of the permits and any actual impact the exploration activities or permit issuance has had on the reasonable concurrent uses or common uses of the land and water as defined by the pertinent sections of Art. VIII and as pled by the Plaintiffs. The court will not conduct its own best interest finding ("BIF") or determine whether the State conducted a "functional equivalent" of a BIF. The court will not need to bifurcate the trial. The court will not entertain evidence or argument about prospective harm due to the development or actual mining within the concerned geographical areas.

_____

[1]      The supreme court adopted a hybrid approach to determining whether a permit is functionally irrevocable.

*Northern Alaska Environmental Center[] v. DNR*, 2 P.3d 629, 638 [(Alaska 2000)]. A permit is functionally irrevocable if the permit is not likely to be revoked because of its magnitude or if there is long-term and harmful environmental impact. *Id*. at 638-39. This test reads consistent with the constitutional commentary on Section 10: "[t]ransactions may vary in importance from routine to those of substantial value."

[2]      "Reasonable concurrent uses" is similarly described in the various sections of Art. VIII as follows: Section 1 - "public interest;" Section 2 - "benefit of the people;" Section 3 - "common use;" Section 4 - "preferences among beneficial uses;" and Section 13 - "common use" and concurrent uses.

A ten-day trial was held. The primary focus of the trial was water contamination issues. Nunamta presented evidence that contamination had and would continue to occur through acid rock drainage. One expert witness, Dr. Moran, described this as "the tendency of mineralized rock that has sulfides . . . to react with air and water, and especially bacteria, to create natural acids that then solubilize the rock and release contaminants." This process occurs both in bore holes and in the sumps, where it is magnified because of the greater surface area of the pulverized drilling waste. According to another of Nunamta's experts, Dr. Zamzow, finely ground mineralized rock, when exposed to wetting and drying conditions, may take up to 15 years to become acidic. Dr. Moran agreed that plugging bore holes would minimize groundwater contamination from them, but testified that often plugging is not complete, allowing chemical and biological reactions to continue. In addition, Dr. Moran testified that the cement grout in plugs degraded over decades and "then you get groundwater contamination long-term."

According to Nunamta's experts, the other major source of potential contamination is the drilling mud. The most commonly used "EZ mud" contains toxic

chemicals. A witness employed by the State Department of Environmental Conservation testified that EZ mud components were toxic to fish in the concentrations found in the water in bore holes but thought that by the time wastewater from a bore hole could travel 100 feet to a water body, it would be greatly diluted and thus "we qualitatively determined that it was unlikely for the drilling additive to reach a water body at a level that would be toxic to fish."

The testimony presented by Nunamta concerning water contamination addressed not only the *potential* for contamination. Dr. Moran testified that his review of the data from several monitoring wells indicated "levels of metals and other anions that if freshwater fish were exposed to them, those would be toxic." Dr. Zamzow also testified that the data collected by Pebble in monitoring wells indicated that drilling is having an impact on water chemistry, although she was unable to state the degree of the impact.

With respect to other impacts, Nunamta presented testimony that some tundra ponds used as water sources for drilling had been temporarily dewatered and that in the past, drilling muds had been discharged into ponds. Nunamta also presented testimony that the frequent helicopter traffic had caused caribou, moose, and brown bear to avoid the area. Further, a guide, Steve Morris, testified that he previously had maintained spike camps for hunters of caribou, moose, and bear, but that the exploration activity had rendered the area unusable, saying, "The helicopter activity in itself is enough that you can't bring a paying client out there, put them in a spike camp, any one of those dozen units that I used to use. They will see more helicopters in one day than they will big game."

PLP also presented expert testimony on the issue of water contamination. PLP's expert, Dr. Stelljes, testified that he reviewed data from 37 monitoring wells and was unable to find any chemical fingerprint indicative of acid rock drainage. It was his

opinion that the exploration activities had not harmed water quality in the area. Dr. Stelljes also testified that drilling mud discharged into the sumps creates an impermeable barrier and is "entombed" between the shallow bedrock below and a "very impermeable" tundra mat and compacted soil above, thus preventing it from migrating into groundwater. In addition he testified that the data Dr. Zamzow relied on as indicating contamination caused by drilling were simply "outliers," that is, sampling errors. PLP also presented evidence that there has been no impact on local caribou or other wildlife as a result of its exploration activities, and that tundra ponds from which water was taken would fully recharge in less than a year.

Following the trial the court issued detailed written findings. The court found that the evidence presented was "insufficient for this Court to find it more likely true than not that the exploration activities at the Pebble study area have actually caused or will in fact cause long-term, harmful environmental impacts from acid rock drainage or other contamination." As to water contamination issues, the court adopted the views advocated by PLP. The court found that Dr. Moran was a trustworthy witness but that his testimony as to toxic concentrations of dissolved metals in monitoring wells did not establish that the elevated levels were caused by exploration activities; the court further discounted this testimony as conclusory, speculative, and lacking a basis in scientific data. The court also observed that Dr. Moran "admitted . . . that fish do not live in the groundwater" and that "Dr. Zamzow similarly admitted that fish are not swimming in underground monitoring wells." "Thus," the court concluded, "elevated levels of metals in groundwater monitoring wells is not evidence probative of impacts to aquatic organisms." The court also concluded that Dr. Zamzow was relying on unreliable outlier data points in reaching her conclusion that some of the monitoring wells indicated ongoing acid rock drainage reactions.

The court also found "that most of the core holes drilled at the Pebble site since 2006 have been plugged" and that "[b]ecause the holes have generally been plugged, the likelihood of acid rock generation is substantially reduced or stopped altogether." With respect to acid rock drainage from the drill cuttings in the sumps, the court found the evidence "insufficient to conclude that the sump pits are in fact generating [acid rock drainage] contamination" and that even if they were "there is no evidence that such contamination is actually migrating to an area in concentrations that may cause harm to a living organism."

With reference to the evidence that PLP had temporarily pumped dry several tundra ponds, the court concluded that this did not necessarily mean that harm to fish and aquatic life had occurred because there would have to be proof that PLP "(1) extracted all the water in a pond, (2) that fish were actually present in the pond, and (3) that the lack of water in fact harmed the fish." The court concluded that there was not credible evidence that all three of these things had occurred. The court further noted that even if all the water were removed from a tundra pond containing blackfish, that would not necessarily mean that the fish would be impacted because they can breathe air for a period of time.

As to impacts on wildlife, the court found that the decline in the number of caribou in the Pebble area was due to the natural migratory nature of caribou and cyclical variations in their population, and not to any of PLP's exploration activities. The court also found there to be insufficient evidence that PLP's exploration activities had caused a permanent impact on any other wildlife in the area.

Concerning the testimony of the guide, Steve Morris, that his guided hunting activities had been displaced by helicopter activity, the court refused to accept this reason, finding it more likely that he no longer used this area because of a change in state hunting regulations that prohibited non-resident hunters from taking caribou.

Further, the court found Morris's reasons were personal and must give way to other interests: "[R]ather, it was a personal preference to avoid signs of civilization when taking clients on wilderness hunting trips. . . . Mr. Morris must share the State resources with other reasonable concurrent users . . . ."

The court concluded in general that Nunamta did not show that it was more likely than not that exploration had caused long-term and harmful environmental impacts in the Pebble project area, or that such harms "necessarily will occur." The court also concluded that PLP's exploration and water use permits were not disposals of interests in State lands and did not unconstitutionally impinge on reasonable concurrent uses. The court's final paragraph stated:

> This Court finds that Plaintiffs failed to prove their case as has been explained in this decision. The MLUP and TWUP permits at issue in this lawsuit do not amount to a disposal of an interest in state lands under Article VIII, Section 10 of the Alaska Constitution. Therefore, the permits in question did not trigger any constitutional requirement for prior public notice or that the State conduct a best interest finding before they issued the permits. The evidence at trial also failed to demonstrate that the permits or the associated mining exploration activity impinged on any reasonable concurrent use or user under Article VIII, Section 8. Based on the evidence provided at trial, it is more likely than not that the permits provided for non-exclusive use of State lands and the activities conducted on site did not cause any significant impact or long-term harm to concurrent uses. Given these conclusions, the relief requested by Plaintiffs is DENIED and judgment is entered in favor of Defendant and Intervenor.

Nunamta appealed to this court.

## III.    ISSUES ON APPEAL

Nunamta has organized its arguments under four main captions as follows:

(1)    "The superior court incorrectly determined that MLUPs and TWUPs were functionally revocable and did not constitute a disposal";

(2)    "The extensive land and water uses were of sufficient magnitude to trigger safeguards of Article VIII, sections 1, 2, 3, 4, 8, 10, 13 and 17";

(3)    "The State failed to undertake the public-interest analysis required by Article VIII prior to issuing the MLUPs and TWUPs"; and

(4)    "The superior court improperly excluded evidence of economic impacts and cumulative impacts, and failed to make findings on Mineral Closing Order 393 and Leasehold Location Order #1."

The State raises two points in its cross-appeal claiming:

(1)    "The superior court should not have allowed Nunamta to litigate two separate cases challenging Pebble's permits"; and

(2)    "The Court should not review specific permitting decisions or weigh in on the general quality of DNR's permitting and enforcement."

## IV.    DISCUSSION

### A.    Issues Addressed

This is a case about process.  Before issuing permits, did the State have a duty under the constitution to give notice and did it have a duty to consider potential consequences of the permitted activity?  The relevant time period raised by these questions is prospective.  They are not answered by an after-the-fact inquiry in which a private party is tasked with the burden of proving that substantial environmental damage has occurred.  The State must know how it should act before it acts.  Similarly, to the extent that the answer to these questions turns on an assessment of the environmental impacts of permitted activities, the assessment must be made prospectively based on

known and reasonably possible consequences. Further, if the duties to give notice and consider potential consequences exist, they are not discharged by the apparent harmlessness of what later takes place; and, if the duties do not exist, they are not created by subsequent acts causing environmental harm. The duties asserted are intended to facilitate public involvement and informed decision making, and to minimize environmental harm and damage to conflicting users. These purposes are not served by a retrospective examination of the nature of the permitted activity.[8]

The central issue as framed by the superior court was an as-applied challenge to the constitutionality of a statute; from the trial court's perspective, some factual context was needed.[9] But this was not an environmental tort case. We consider the issues presented here to be primarily ones of law; the tests for functional revocability require consideration of the future, not a detailed assessment of environmental harm to date.[10] While environmental harm resulting from past exploration activities would be relevant to the question of whether present or future permits are not functionally revocable, the absence of present harm would not necessarily mean that the permits are functionally revocable. The position taken by the State and PLP at the summary judgment level was that the dispositive issues in this case could be resolved as questions of law. We agree, as shown by our resolution of this case, and it is to be hoped that

---

[8]    As we observed in *Trustees for Alaska v. State, Department of Natural Resources*, 865 P.2d 745, 750 n.7 (Alaska 1993), a best interest determination "must take place before the lease decision is made, not as an after-the-fact exercise."

[9]    *Kyle S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 1262, 1268 (Alaska 2013) (citation omitted).

[10]    A similar situation arose in *Sullivan v. Resisting Environmental Destruction on Indigenous Lands (REDOIL)*, where the superior court considered an as-applied challenge to a constitutional question that we addressed in broader terms. 311 P.3d 625, 627, 633 (Alaska 2013).

future cases involving process issues will be resolved on motion practice, thus avoiding the expense of a lengthy trial.

All the permits that were challenged in this case have expired. As to them, this case is moot. A suit challenging the lawfulness of a government-issued permit is technically moot once the permit has expired.[11] It is not clear from the record that PLP is conducting or intends to conduct similar exploration activities in the future. But still pending are proceedings in which the State and PLP are seeking large awards of attorney's fees and costs. Since these awards depend on a prevailing party determination, this case remains a live controversy for the purpose of determining which party prevailed. Mootness on the merits notwithstanding, our determination that the MLUPs were functionally irrevocable may serve as a useful precedent to DNR when it is faced with the question of whether to give prior public notice before issuing permits in future similar cases.

A second important question is potentially presented. As expressed by the superior court in the concluding paragraph of its decision, did the Constitution require DNR to "conduct a best interest finding" before issuing the permits, even if a statute or regulation did not? The superior court answered this question in the negative, but only because it concluded that the permits were not disposals of an interest in land. This conclusion must be vacated based on our holding that the MLUPs were disposals of an interest in land. The parties have briefed the impact that *Sullivan v. Resisting Environmental Destruction on Indigenous Lands (REDOIL)*,[12] decided by this court after the present case was appealed, may have on this issue. In *REDOIL* we held that while article VIII does not require written best interest findings, it does require some form of

---

[11]    *See Alaska Cmty. Action on Toxics v. Hartig*, 321 P.3d 360, 366 (Alaska 2014).

[12]    311 P.3d at 625.

continuing assessment of factors relevant to the public interest during the course of a natural resources project, particularly when a permit authorizing future activities is contemplated.[13] Given our resolution of the present case, we need not resolve whether and how *REDOIL* should be applied to the issuance of permits like those involved in the present case.

We do not address Nunamta's other arguments for they raise issues as to the validity of permits that have expired, and no good purpose would be served by deciding them.

We address the issues raised in the State's cross-appeal, for they raise a potential procedural bar to Nunamta's lawsuit.

All the questions reviewed in this appeal are questions of law. The standard of review we use in deciding them is the non-deferential "independent judgment" standard under which this court adopts "the rule of law most persuasive in light of precedent, reason, and policy."[14]

B.    **Cross-Appeal Issues — This Case Is Not Barred By The Doctrine Of Failure To Exhaust Administrative Remedies Or The Rule Prohibiting Claim Splitting.**

The State argues that this appeal should be dismissed because Nunamta should have exhausted its administrative remedies by litigating the issues presented in this case in the administrative appeal rather than by filing a separate declaratory judgment action. The State also argues that by pursuing both the administrative action and the declaratory judgment action, Nunamta violated the doctrine prohibiting splitting a cause of action.

---

[13]    *Id*. at 634-37.

[14]    *J.P. v. Anchorage Sch. Dist.*, 260 P.3d 285, 289 (Alaska 2011) (quoting *Jacob v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 177 P.3d 1181, 1184 (Alaska 2008)) (internal quotations marks omitted).

The State raised the exhaustion issue twice. In September 2009 the State moved to dismiss on grounds that included failure to exhaust. The State noted that with respect to the 2009 MLUP, Nunamta was pursuing a timely administrative remedy before DNR and that Nunamta should not be allowed to short-circuit that proceeding with an original action. Acknowledging that Nunamta had raised constitutional claims, the State argued that the administrative remedy would be appropriate in order to supply a factual context in which constitutional issues could be decided.

Nunamta opposed on the ground that exhaustion is not required where only constitutional issues are raised. It also argued that exhaustion was not required because DNR's appeal process was dysfunctional and exhaustion would be futile given DNR's inaction in the administrative appeal and its evident partiality.

The superior court, Judge Craig Stowers presiding, denied the State's motion, ruling that forcing this case into an agency forum would probably not "appreciably advance the issues in the case, especially in light of the fact that both the state and the plaintiffs are arguing that these are essentially pure questions of constitutional law in some sense or another." The court also observed, "I don't see that the facts are necessarily inextricably intertwined with the constitutional law principles." The court also stated that in view of the full briefing on the issues, "I'm not sure why I couldn't rule on them as a matter of law."

After the case was reassigned and Judge Aarseth ruled on the appellee's motions for summary judgment, both PLP and the State again moved to dismiss the case on failure to exhaust grounds. As an alternative to dismissal, PLP asked for a remand to DNR so it could conduct any needed evidentiary hearing.[15] The State also asked for

---

[15] PLP stated:

> Rather than an unwieldy trial where this Court is asked

(continued...)

an alternative to dismissal, seeking an order converting the case to an administrative appeal. The State's theory was that because, under the court's order on the summary judgment motions, the propriety of DNR's issuance of the permits was at issue, Nunamta's claim was functionally an administrative appeal and it should be considered as such. Citing *Yost v. State, Division of Corps.*,[16] the State argued, "When a court could not grant the relief requested without reversing the prior agency determination, the claim should be treated as an administrative appeal." The trial court denied the motions in October 2010. The court acknowledged that "an administrative record would likely make the fact-finding process more efficient" but concluded that "the administrative process is not necessary and would unnecessarily delay a decision in this case."

Generally, a party who wishes to challenge action by an administrative agency must do so using available administrative procedures before filing suit in court.[17] The doctrine of exhaustion of remedies is a salutary one whose basic purpose "is to allow

---

[15](...continued)

> to make independent evaluations on a myriad of highly technical areas, all of which are beyond the typical realm of the judiciary, the Court should first allow for a comprehensive agency record to be developed by the agency that has the technical knowledge and expertise to address this many highly convoluted issues. The option is almost certainly a trial of much longer and larger proportions than presently contemplated, on numerous issues for which there are no established legal standards or other guideposts for the Court. A better approach would be to allow the agency to make[] its factual record, and then, if necessary, the case can come back up to this Court on review of the governing constitutional law.

[16]     234 P.3d 1264 (Alaska 2010).

[17]     *Ben Lomond, Inc. v. Municipality of Anchorage*, 761 P.2d 119, 121-22 (Alaska 1988).

an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies."[18]  But when a case raises solely constitutional issues exhaustion is generally not required.[19]  However, even then exhaustion may be ordered so that a court will "have a factual context within which to review a case."[20]  The doctrine of exhaustion is not a strict jurisdictional rule; rather it is a rule of sound judicial administration.[21] "Whether a court will require exhaustion of remedies turns on an assessment of the benefits obtained through affording an agency an opportunity to review the particular action in dispute."[22]

When Judge Stowers denied the State's first motion to dismiss based on exhaustion grounds, he did so because the issues seemed to be pure questions of constitutional law.  In light of the constitutional law exception to the exhaustion doctrine, this ruling was not an abuse of discretion.[23]

With respect to the second round of motions to dismiss on exhaustion grounds, we think that the motions were properly denied, though not necessarily for the reasons stated by the court.  In our view the dispositive questions presented remained

---

[18]     *Van Hyning v. Univ. of Alaska*, 621 P.2d 1354, 1355-56 (Alaska 1981) (quoting *Parisi v. Davidson*, 405 U.S. 34, 37 (1972)) (internal quotation marks omitted).

[19]     *See Ben Lomond, Inc.*, 761 P.2d at 122.

[20]     *Id*.

[21]     *Id*. at 121 (citing *State, Dep't of Labor v. Univ. of Alaska*, 664 P.2d 575, 581 (Alaska 1983)).

[22]     *Id.*

[23]     *See Eufemio v. Kodiak Island Hosp.*, 827 P.2d 95, 98 (Alaska 1992) (citation omitted) (stating that superior court has discretion to require exhaustion.

relatively discrete questions of constitutional law that would fall under the exception for such questions.

Further, outright dismissal for failure to exhaust would not have been appropriate given that at the time of the second round of motions Nunamta still had an active administrative proceeding pending. It could have been appropriate to take either alternative course suggested by the appellees, but since Nunamta had in no sense slept on its rights and all parties were aware of its claims, outright dismissal would have been unwarranted.

We turn now to the State's claim splitting argument. "The rule against claim splitting provides that all claims arising out of a single transaction must be brought in a single suit, and those that are not become extinguished by the judgment in the suit in which some of the claims were brought."[24] We conclude that this rule does not apply here for a number of reasons.

First, DNR's decision was based on standing grounds, although DNR indicated that it would deny the appeal on the merits as well. The superior court ruled that DNR erred in relying on the alleged lack of standing but that DNR's decision could be affirmed on the merits. That decision was appealed to this court, and we ultimately dismissed the appeal as moot. But our decision was based on the implicit premise that not only was the case moot because the permit in question had expired, it was also moot because any underlying questions of importance could be determined in the present case. Given the apparent role of the present case in the ultimate resolution of the administrative appeal, that resolution cannot have a preclusive effect on this case.

In addition, DNR is a forum of limited jurisdiction that lacks authority to issue declaratory relief. The rule prohibiting splitting claims does not apply to forums

---

[24]  *Robertson v. Am. Mech., Inc.*, 54 P.3d 777, 780 (Alaska 2002) (citations omitted) (internal quotation marks omitted).

of limited jurisdiction that lack the authority to grant all the forms of relief a plaintiff requests.[25]

Finally, the rule prohibiting claim splitting would not apply to those appellants — Willson, Fischer, and Hammond — who were not parties to the administrative appeal.

**C.     The MLUPs Were Disposals Of An Interest In Land.**

We now address Nunamta's argument that the MLUPs were disposals of an interest in land that come within the protection of the public notice clause of article VIII, section 10 of the Alaska Constitution.  We do not discuss TWUPs at this point because they do not lend themselves to the same analysis as MLUPs.  We also focus only on the 2009 MLUP because the details of this permit are clearly in the record and the activities allowed under this permit appear to be representative of the activities under MLUPs issued for the period 2002 to 2008.

Nunamta argues in general that the MLUPs were disposals of interests in land that fall within the protection of article VIII, section 10.  It argues that under either of the tests for functional irrevocability adopted by this court in *Northern Alaska*

---

[25]     The Restatement (Second) of Judgments § 26(1)(c) (1982) expresses the exception in this way:

> (c) The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief.

*Environmental Center v. State, Department of Natural Resources*,[26] the MLUPs are functionally irrevocable and therefore are easements rather than licenses and thus interests in land.  The State and PLP argue in general that the MLUPs are neither interests in land nor disposals and further that the tests for functional irrevocability are not satisfied.

We will now summarize the relevant legal authorities.

### 1.    Constitutional provisions

The constitutional provision most centrally involved in this case is article VIII, section 10, the Public Notice Clause, which provides that "[n]o disposals or leases of state lands, or interests therein, shall be made without prior public notice and other safeguards of the public interest as may be prescribed by law."  A number of other sections of article VIII are relied on by the parties, including section 1, Statement of Policy;[27] section 2, General Authority;[28] section 3, Common Use;[29] section 4, Sustained Yield;[30] section 8, Leases;[31] section 11, Mineral Rights;[32] section 13, Water Rights;[33]

---

[26]    2 P.3d 629, 637-39 (Alaska 2000).

[27]    Art. VIII, §1 - Statement of Policy.  It is the policy of the State to encourage the settlement of its land and the development of its resources by making them available for maximum use consistent with the public interest.

[28]    Art. VIII, §2 - General Authority.  The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people.

[29]    Art. VIII, §3 - Common Use.  Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.

[30]    Art. VIII, §4 - Sustained Yield.  Fish, forests, wildlife,

(continued...)

[30](...continued)

grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses.

[31] Art. VIII, §8 - Leases. The legislature may provide for the leasing of, and the issuance of permits for exploration of, any part of the public domain or interest therein, subject to reasonable concurrent uses. Leases and permits shall provide, among other conditions, for payment by the party at fault for damage or injury arising from noncompliance with terms governing concurrent use, and for forfeiture in the event of breach of conditions.

[32] Art. VIII, §11 - Mineral Rights. Discovery and appropriation shall be the basis for establishing a right in those minerals reserved to the State which, upon the date of ratification of this constitution by the people of Alaska, were subject to location under the federal mining laws. Prior discovery, location, and filing, as prescribed by law, shall establish a prior right to these minerals and also a prior right to permits, leases, and transferable licenses for their extraction. Continuation of these rights shall depend upon the performance of annual labor, or the payment of fees, rents, or royalties, or upon other requirements as may be prescribed by law. Surface uses of land by a mineral claimant shall be limited to those necessary for the extraction or basic processing of the mineral deposits, or for both. Discovery and appropriation shall initiate a right, subject to further requirements of law, to patent of mineral lands if authorized by the State and not prohibited by Congress. The provisions of this section shall apply to all other minerals reserved to the State which by law are declared subject to appropriation.

[33] Art. VIII, §13 - Water Rights. All surface and subsurface waters reserved to the people for common use, except mineral

(continued...)

section 14, Access to Navigable Waters;[34] and section 17, Uniform Application.[35]

## 2.    Statutory and regulatory authority for MLUPs

Many uses of the public domain are allowed without a permit.[36] Such uses include not only ordinary activities such as hiking, bicycling, and travel by horse, dogsled, or snow machine,[37] but also more intrusive ones such as "brushing or cutting a trail less than five feet wide using only hand-held tools"[38] and "hard-rock mineral prospecting or mining using light portable field equipment, including a hand-operated

---

[33](...continued)
> and medicinal waters, are subject to appropriation. Priority of appropriation shall give prior right. Except for public water supply, an appropriation of water shall be limited to stated purposes and subject to preferences among beneficial uses, concurrent or otherwise, as prescribed by law, and to the general reservation of fish and wildlife.

[34]    Art. VIII, §14 - Access to Navigable Waters.  Free access to the navigable or public waters of the State, as defined by the legislature, shall not be denied any citizen of the United States or resident of the State, except that the legislature may by general law regulate and limit such access for other beneficial uses or public purposes.

[35]    Art. VIII, §17 - Uniform Application.  Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation.

[36]    The regulation that defines such uses is 11 Alaska Administrative Code (AAC) 96.020 (2014).

[37]    11 AAC 96.020(a).

[38]    11 AAC 96.020(a)(2)(A).

pick, shovel, pan, earth auger, or a backpack power drill or auger."[39]  But a permit is required for "an activity involving . . . the use of explosives and explosive devices" or "drilling to a depth in excess of 300 feet, including exploratory drilling or stratigraphic test wells."[40]

For uses that are not generally allowed, DNR has regulatory authority to issue permits for a specified term up to five years unless sooner revoked.[41]  Such permits are MLUPs and they are authorized under Title 11, chapter 96 of the Alaska Administrative Code.[42]  The stated purpose of chapter 96 "is to manage uses and activities on state public domain land . . . in order to minimize adverse effects on the land and its resources."[43]  The regulation specifically authorizing MLUPs is 11 AAC 96.040, which provides in relevant part:

> (a)  Issuance of a permit under this chapter is not a disposal of an interest in land, and does not grant a preference right to a lease or other disposal.  The permit is revocable for cause for violation of a permit provision or of this chapter, and is revocable at will if the department determines that the revocation is in the state's interest.  The permit remains in effect for the term issued, unless revoked sooner.  The department will give 30 days' notice before revoking a permit at will.  A revocation for cause is effective immediately.
>
> (b)  Each permit issued is subject to any provisions the department determines necessary to assure compliance with this chapter, to minimize conflicts with other uses, to

---

[39]    11 AAC 96.020(a)(3)(F).

[40]    11 AAC 96.010(a)(1)(A) and (D).

[41]    11 AAC 96.040(c).

[42]    *Id*.

[43]    11 AAC 96.005.

minimize environmental impacts, or otherwise to be in the interests of the state.

(c) . . . [A] permit will be granted for a specified term of up to five years, unless revoked sooner. . . . [T]he permit may be extended for any number of consecutive periods, each period not to exceed one year. . . .

. . . .

(f)  A permit under this chapter does not authorize the placement of permanent improvements.  Temporary improvements authorized by a permit under this chapter must be removed when the permit expires or is revoked, unless otherwise specified by the department.

Three statutory sections are cited in this regulation as authority for its promulgation: AS 38.05.020, AS 38.05.035, and AS 38.05.850. Alaska Statute 38.05.020(b)(4) authorizes the Commissioner of the Department of Natural Resources to "exercise the powers and do the acts necessary to carry out the provisions and objectives of [chapter 5 of Title 38]," which establishes the Division of Lands within the Department and specifies its functions and responsibilities.

Alaska Statute 38.05.035 defines the powers and duties of the Director of the Division of Lands.  Pertinent to this case, AS 38.05.035(e) provides:

Upon a written finding that the interests of the state will be best served, the director may, with the consent of the commissioner, approve contracts for the sale, lease, or other disposal of available land, resources, property, or interests in them. . . . The preparation and issuance of the written finding by the director are subject to the following:

. . . .

(6) . . . however, a written finding is not required before the approval of

. . . .

(C) a permit or other authorization revocable by the commissioner; [or]

. . . .

(H) a permit, right-of-way, or easement under AS 38.05.850[.]

Alaska Statute 38.05.850 deals specifically with permits. It provides in part:

(a) The director, without the prior approval of the commissioner, may issue permits, rights-of-way, or easements on state land for roads, trails, ditches, field gathering lines or transmission and distribution pipelines not subject to AS 38.35, telephone or electric transmission and distribution lines, log storage, oil well drilling sites and production facilities for the purposes of recovering minerals from adjacent land under valid lease, and other similar uses or improvements, or revocable, nonexclusive permits for the personal or commercial use or removal of resources that the director has determined to be of limited value. . . . In the granting, suspension, or revocation of a permit or easement of land, the director shall give preference to that use of the land that will be of greatest economic benefit to the state and the development of its resources.

Another statutory section, AS 38.05.945, provides for notice to be given by DNR for certain actions. Subsection (e) of this section states that "[n]otice is not required under this section for a permit or other authorization revocable by the department."

### 3.    Mineral locations

Article VIII, section 11 of the Alaska Constitution establishes the basis for locatable mineral rights. It provides: "Prior discovery, location, and filing, as prescribed by law, shall establish a prior right to these minerals and also a prior right to permits, leases, and transferable licenses for their extraction."

Holders of mining claims acquired by discovery, location, and filing do not have an automatic right to mine their claims. To actually extract minerals, they must acquire the necessary permits.[44] Likewise, they have no automatic right to engage in intensive exploration activities, that is, in activities that are not generally allowed to any member of the public without a permit.[45] For intensive exploration activities, a MLUP is required.

### 4. Why the MLUPs are disposals of an interest in land

The Public Notice Clause of the Alaska Constitution, article VIII, section 10, prohibits disposals of interests in state lands without prior public notice. The central question posed by Nunamta's appeal is whether the MLUPs are disposals of interests in state land under the Public Notice Clause. A permit that is revocable at the will of the grantor is generally considered a license.[46] We recently stated that "[t]he grant of an easement is a conveyance or disposal of an interest in land within the meaning of [the Public Notice Clause], but the transfer of a license or a permit generally is not."[47]

---

[44] *See Beluga Mining Co. v. State, Dep't of Natural Res.*, 973 P.2d 570, 575 (Alaska 1999) (noting that company with claim "had no right to mine" but had to seek permission to do so).

[45] See 11 AAC 96.020; *supra* pp. 29-30.

[46] *N. Alaska Envtl. Ctr. v. State, Dep't of Natural Res.*, 2 P.3d 629, 635 n.23 (Alaska 2000) (citations omitted).

[47] *SOP, Inc. v. State, Dep't of Natural Res., Div. of Parks & Outdoor Recreation*, 310 P.3d 962, 967 (Alaska 2013) (citing *Laverty v. Alaska R.R. Corp.*, 13 P.3d 725, 736 & n.54 (Alaska 2000)); *see also* JON W. BRUCE & JAMES W. ELY, JR., THE LAW OF EASEMENTS AND LICENSES IN LAND § 11:1 (2014) ("Generally a license is not viewed as an interest in the land."); *see also, e.g.*, *Rau v. Collins*, 891 A.2d 1175, 1184 (Md. App. 2006) (noting that license is a personal privilege rather than an interest in the land); *Wilson v. Staats*, 751 S.E.2d 747, 751 (W. Va. 2013) (noting that essential characteristic of license is that it does not create an interest in land, only a "personal and

(continued...)

Nonetheless, whether a transfer may be characterized as a license is not necessarily determinative of a contention that the Public Notice Clause applies, and we hold here, consistent with *Northern Alaska*, that licenses that are functionally irrevocable under the tests set out in that case[48] are interests in land requiring prior public notice under the Public Notice Clause. We further hold that the MLUPs in this case are functionally irrevocable.[49] We so conclude because their revocation or non-renewal would substantially destroy PLP's investment of hundreds of millions of dollars and would leave in place large-scale and long-lasting changes to the land which cannot be removed without significant damage to it, and because the State has recognized the public importance of allowing PLP's exploratory activities to proceed as a necessary step in the development of a mine.

---

[47](...continued)
revocable privilege"). *But see* RESTATEMENT (FIRST) OF PROPERTY § 512 cmt. c (1944); 4 RICHARD R. POWELL, POWELL ON REAL PROPERTY § 34.25 (Michael Allan Wolf ed., 2014) ("So long as it continues, a license derogates from the completeness of the servient owner's ownership, and this requires its recognition as an 'interest in land.' "); 8 THOMPSON ON REAL PROPERTY, SECOND THOMAS EDITION § 64.02(b) (David A. Thomas, ed. 1998). *Cf.* AS 44.88.900(14) (including licenses in "interests in land" for Alaska Industrial Development and Export Authority).

[48]     *N. Alaska Envtl. Ctr.*, 2 P.3d at 637-39.

[49]     We do not decide here that all MLUPs are disposals of interests in State land; MLUPs authorize a wide variety of activities, some of which are low-impact and temporary and are clearly not functionally irrevocable. Public notice is constitutionally required only when a MLUP is functionally irrevocable. *Cf.* AS 38.05.850(c) (requiring prior public notice of easement or right-of-way that director determines is not functionally revocable).

In *Northern Alaska*, we adopted from the D.C. Circuit two tests of functional irrevocability.[50] We used these tests to assess whether a right-of-way that was revocable on its face was truly revocable and thus exempt from the best interest finding of the Alaska Land Act.[51] The first test as we described it in *Northern Alaska* "focuses on the likelihood of revocation as opposed to the mere legal right to revoke."[52] We explained that "where revocation would result in the destruction of the licensee's sizeable investments" a permit would not be revocable because the reserved right of revocation is contradicted by "the reality that the permit is functionally irrevocable."[53] We described the second test as focusing "on whether, upon revocation, the licensee could remove the installed structures, or otherwise vacate the land, without permanently damaging or destroying the property for governmental use."[54] We noted that in *Wilderness Society* the court found that the permit failed to pass this test because a proposed gravel work pad "could not 'be removed without producing permanent and deleterious changes in the underlying land.' The court cited harmful effects with respect to vegetation, erosion, and the permafrost."[55]

Both the State and PLP argue that the *Northern Alaska /Wilderness Society* analysis as to whether a permit is functionally irrevocable should not be applied to determine whether the constitution's Public Notice Clause has been triggered because

---

[50]     *N. Alaska Envtl. Ctr.*, 2 P.3d at 638.

[51]     *Id*. at 637-39.

[52]     *Id.* at 638 (quoting *Wilderness Soc'y v. Morton*, 479 F.2d 842, 871 (D.C. Circ. 1973) (en banc)) (internal quotation marks omitted).

[53]     *Id.*

[54]     *Id*.

[55]     *Id.* (footnote omitted) (quoting *Wilderness Soc'y*, 479 F.2d at 874-75).

both *Northern Alaska* and *Wilderness Society* involved statutory and regulatory requirements, not constitutional interpretation. But they offer little or nothing by way of substantive reasons as to why the revocability analysis of those cases should not apply.

Both the Alaska Land Act and the Public Notice Clause concern disposals of interests in land.[56] Indeed, the Alaska Land Act was meant to provide guidance as to the type of process to be used when the State disposes of an interest in land.[57] The functional irrevocability analysis is designed to determine whether permits purporting to be revocable at will, and thus akin to licenses, are not truly revocable, and therefore are more like easements.[58] The premise of the analysis is that the substance of an interest rather than its form should control when considering its legal effect.[59] This premise surely applies as strongly to effects under constitutional provisions as to those under statutes or regulations. Indeed, in *Northern Alaska* we decided that we should analyze the permit there for functional irrevocability because article VIII of the Alaska

---

[56] *Compare* Alaska Const. art. VIII, § 10, *with* AS 38.05.035(e).

[57] *See Alyeska Ski Corp. v. Holdsworth*, 426 P.2d 1006, 1010-11 (Alaska 1967) (observing that legislature enacted the Alaska Land Act in accordance with the Public Notice Clause).

[58] *See SOP, Inc. v. State, Dep't of Natural Res., Div. of Parks & Outdoor Recreation*, 310 P.3d 962, 967-68 (Alaska 2013) (discussing difference between easements and licenses).

[59] Our cases consistently demonstrate that we look at the substance of the interest rather than its form in considering whether the Public Notice Clause applies. For example, in *Laverty v. Alaska Railroad Corp.*, we decided that what the Railroad called a "license" was in fact an easement, specifically a profit, because it permitted the removal of gravel from the land. 13 P.3d 725, 735-36 (Alaska 2000). And in *SOP, Inc.*, we decided that permits for ATV use on state park lands were easements because they were revocable only for cause and had other easement characteristics. 310 P.3d at 968-69.

Constitution reflects the "importance of our land resources and of the concomitant necessity for observance of legal safeguards in the disposal or leasing of state lands."[60] Article VIII "reflects the framers' recognition" of these concerns.[61] Just as they serve as a guide to interpreting statutes and regulations, they should also guide the interpretation of a constitutional provision.

Turning to the question of the applicability of the *Wilderness Society* tests to this case, Nunamta argues that under both tests, the MLUPs are functionally irrevocable. As to the first — the destruction of the licensee's investment test — Nunamta points to trial testimony by PLP's vice-president of environment that PLP had invested "$300-$400 million" dollars in exploration since 2002.[62] According to Nunamta, the superior court incorrectly and inappropriately focused only on "permanent, concrete and steel infrastructure" in examining PLP's investment; instead Nunamta asserts "that the size of the investment at risk is enough, in itself, to deter revocation" because if development is stopped, PLP's investment will have no value. Nunamta argues that the State is also invested in the continuation of the project, pointing to the Memorandum of Understanding (MOU) between the State and PLP, under which PLP agreed to reimburse the State for costs associated with, among other things, the State's

---

[60]     *N. Alaska Envtl. Ctr.*, 2 P.3d at 638 (quoting *Alyeska Ski Corp.*, 426 P.2d at 1011) (internal quotation marks omitted).

[61]     *Alyeska Ski Corp.*, 426 P.2d at 1011.

[62]     PLP contends that "Nunamta improperly looks outside the trial record" to make these arguments. Although Nunamta discusses positions taken by the State and PLP at earlier phases of the litigation and the evidence submitted by them to support these positions, Nunamta also points to trial testimony and exhibits to support its arguments.

consideration of PLP's requests for permits.[63]  By the time of trial, the estimated costs

associated with the MOU for the fiscal years 2007 to 2011 totaled more than $2 million;

the MOU listed a number of state employees whose salaries could be paid in part by

PLP.

To further support its argument that the permits were functionally

irrevocable because of potential loss of investment, Nunamta cites arguments and

affidavits submitted by PLP and the State during the preliminary injunction phase of the

case that contended there would be significant "destruction of the licensee's investments"

resulting even from a preliminary injunction.  PLP argued at the preliminary injunction

phase that "Pebble's ability to further this project, and to realize a return on its

investment, would be impaired by an injunction," claiming that a preliminary injunction

"would have a ripple effect throughout the entire operation, and would cause a major loss

of jobs and economic activity in Alaska."

PLP objects to Nunamta's reliance on the affidavits, asserting that only

evidence presented at trial can be used in our review of the case.[64]  PLP specifically

---

[63]     The MOU had an initial term of only part of 2004, but it was extended
several times.  The MOU appears to contemplate a continuing relationship between the
State and PLP: "Specific tasks to be addressed" by the interagency review team included
"[d]am permitting efforts for any tailings impoundments, water supply reservoirs, etc."
and "provid[ing] a coordinated effort on the State's part in the NEPA process."

[64]     The case PLP relies on is distinguishable.  In *Paula E. v. State, Department
of Health & Social Services, Office of Children's Services*, we held that we would not
consider unadmitted exhibits in the trial record, including a home study, in our review
of the trial court's factual findings.  276 P.3d 422, 430 (Alaska 2012).  We expressed
concern that parties have no opportunity to respond to exhibits that are not admitted, and
we concluded that the trial court had not relied on the documents in reaching its decision
in any event.  *Id.* (citation omitted).  Here the documents in question are affidavits that
were offered by parties opposing Nunamta, *cf.* Alaska R. Evid. 801(d)(2) (defining as not
hearsay an admission by a party-opponent), so there is no question of the opposing
(continued...)

refers to Nunamta's use of the affidavit of Richard Hughes, "an employee of the Alaska Department of Commerce, Community and Economic Development" at the time he signed his affidavit.[65] Hughes's affidavit detailed the importance of the exploration project and tied investment in exploration to investment in mine development; he attested to the importance of mining to the Alaska economy. The superior court, at the State's request, ruled before trial that Nunamta could not present evidence about "economic issues" at trial, including the testimony of an expert in "Natural Resource Economics" that Nunamta had retained to address the information in Hughes's affidavit. The superior court narrowed the issues to be presented at trial to include "any actual impact the exploration activities or permit issuance has had." By removing economic information from the trial, the superior court in effect prevented the presentation of evidence on one of the tests of functional revocability — whether the licensee's investment depends on the continuing availability of the permit — and thereby took away from Nunamta any opportunity to present this type of evidence at trial.[66] Under these circumstances, we conclude that Nunamta can properly rely on the affidavits; PLP does not argue that they

---

[64](...continued)
parties lacking an opportunity to respond to or challenge the evidence now questioned on appeal. In addition, PLP does not contest the authenticity or veracity of the affidavits. We also note that the superior court specifically mentioned one of the affidavits — that of Richard Hughes — in its oral decision denying a preliminary injunction.

[65] We note there was considerable pretrial motion practice about the possibility of Hughes being a trial witness.

[66] *N. Alaska Envtl. Ctr. v. State, Dep't of Natural Res.*, 2 P.3d 629, 638 (Alaska 2000) (quoting *Wilderness Soc'y v. Morton*, 479 F.2d 842, 873 (D.C. Cir. 1973) (en banc)).

are inaccurate, and the affidavits and arguments from the earlier proceedings provide context for application of the destruction of the investment test.[67]

The State argues that the destruction of sizable investment test only applies where the licensee builds improvements on the property, not where the investment is in exploration. Noting the inherently speculative nature of mineral prospecting, the State contends that

> [t]he value of the information Pebble collects depends not on the permit it was collected under, but on the value of Pebble's claims, which in turn depends on a host of other factors like ore quality, the markets, technology, and, ultimately, whether Pebble can secure permission to mine.  But the risk that the stars will not align is Pebble's to bear. . . .

To illustrate its point, the State quotes from a law journal article on the Pebble exploration that states "[w]here government approval is required but not assured for a project, any investment in that project is akin to a business gamble."[68]

The superior court based its decision that "revocation would not result in the destruction of Pebble's investment" on the lack of "permanent infrastructure or installments on the land."  Although the superior court acknowledged that "Pebble has spent a significant amount of money on exploration and environmental studies," the court also considered that the sole purpose of these activities was "to collect intellectual property."[69]  It then found that "[e]vacuating the site upon revocation would not damage

---

[67]    *See also Laverty v. Alaska R.R. Corp.*, 13 P.3d 725, 728 (Alaska 2000) (noting railroad's prior statements from legislative audit about nature of agreement).

[68]    Geoffrey Y. Parker et al., *Pebble Mine: Fish, Minerals, and Testing the Limits of Alaska's "Large Mine Permitting Process,"* 25 ALASKA L. REV. 1, 49-50 (2008).

[69]    In support of this conclusion, the superior court cited its earlier findings about PLP's exploration activities.

the scientific information Pebble has gathered."[70]  We found no evidence that the scientific information has value independent of its use to develop the mine, and the superior court cited none; in earlier pleadings PLP asserted that "[t]he primary purpose of Pebble's environmental baseline research is to provide the necessary information to enable Pebble to make informed business decisions" about mine development and engineering if development proceeded.

We agree with Nunamta that the hundreds of millions of dollars invested in exploration by PLP, including the money PLP furnishes to the State to pay for the permitting process, is the investment that must be considered.  The potential loss of an investment of this magnitude could deter DNR from cutting short PLP's exploration process by revoking or not renewing a permit.  Such an act could signal the end of the development and thus make useless the data that PLP had already gathered.

We do not agree with the State that the destruction of sizeable investments test only applies to investment in physical improvements, as the superior court evidently believed.  A land manager could easily be reluctant to revoke a permit if doing so rendered valueless an investment of hundreds of millions of dollars related to a necessary step in a significant economic venture regardless of whether physical improvements were created.  The point of the test is that where large sums have been invested, the government is effectively forced to honor the full term of the permit, because revoking it prematurely would cause a significant loss.  That is the case here.

---

[70]     The superior court's record citation to support this statement is a reference to page 2 of its Findings of Fact and Conclusions of Law; that page only names some of the parties to the action.  In its written closing argument in the superior court PLP relied on testimony of two of its witnesses to assert that intellectual property was created; neither witness testified that the information would have any value independent of the project.  In the transcript portion cited by PLP, one witness testified about the lack of permanent, above-ground structures at the drilling sites; the other testified that mapping wetlands was done "for the environmental baseline document."

Nunamta also argues that the perceived public importance of the exploration would deter revocation. Relying on the MOU Nunamta asserts that some 58 State employees have been assigned to work on the project and that PLP will reimburse the State at least in part for their work. Under the MOU an estimated two million dollars in billings were budgeted for reimbursement over five years. Additionally, according to Hughes's affidavit, in excess of 610 jobs would be lost if PLP's exploration efforts were shut down. Nunamta also cites Hughes's testimony as demonstrating that the State's perception is that the suspension of the exploration permits would harm the entire mining industry in Alaska.

To discount Nunamta's public importance argument the State contends that "[t]o the extent that Pebble is important to the public, it is the mineral deposits themselves and the potential mine that are important, not the exploration authorized by the MLUPs." But the mineral deposits and potential mine can never be developed without the continuing, extensive exploration authorized by the MLUPs. The scope and number of the claims have expanded considerably since PLP and its predecessors began exploratory drilling under the MLUPs.

We agree with Nunamta that the perceived public importance of the exploration also would deter DNR from cutting short the exploration process. According to Hughes's affidavit, such an act would result in the loss of employment of many hundreds of people. In addition, according to Hughes, it would send a negative message to the mining industry that Alaska's regulatory climate is unsettled and that Alaska has "seemingly capricious regulations." This message would "deter companies looking for new projects," "definitely impact exploration investment," and harm "the mining industry in Alaska, and the Alaskan economy generally."

The perceived public importance of permitting the exploration of the Pebble ore deposit is underscored by a letter from the Governor of Alaska to the

U.S. Environmental Protection Agency urging the agency not to invoke a procedure that could effectively prohibit development of the Pebble mine "prematurely," that is, without allowing the mine to advance to the development permitting phase. In the letter the Governor states: "There has been tremendous investment in the area based on the potential for mineral development. We cannot fathom the liability and legal challenges that could accompany an unprecedented, after-the-fact determination by the federal government that mineral development from these State lands is no longer viable."[71]

We conclude that the first *Wilderness Society* test has been satisfied. It is easy to see how a state land manager could feel tremendous pressure not to revoke or refuse to renew a MLUP thereby imposing a loss of hundreds of millions of dollars in exploration funds and hundreds of jobs as well as risking the loss of the State's credibility as a location for future mining projects. Based on the record, there was a "negligible likelihood" that a MLUP would be revoked.[72]

With respect to the second *Wilderness Society* test, Nunamta starts with the language of *Northern Alaska* describing this test: "[T]he court focuses on whether, upon revocation, the licensee could remove the installed structures, or otherwise vacate the land, without permanently damaging or destroying the property for governmental use."[73] Nunamta argues that the remnant bore holes and their plugs are concrete and steel

---

[71]    Letter of September 21, 2010 from Governor Sean Parnell to The Honorable Lisa P. Jackson, Administrator, U.S. Environmental Protection Agency. The Governor also notes that 70 percent of area residents are Alaska Native and 17 percent fall below the poverty level, and requests that the EPA "take into account that a . . . decision to preclude mining in this economically depressed region would abruptly and conclusively deny area residents any opportunity to avail themselves of the benefits they might seek from responsible mining."

[72]    *See N. Alaska Envtl. Ctr. v. State, Dep't of Natural Res.*, 2 P.3d 629, 639 (Alaska 2000) (holding that permit had "negligible likelihood of revocation").

[73]    *Id*. at 638.

structures that cannot be removed without producing permanent harm. Nunamta also points to the "enormous quantity of waste materials" that PLP is "as a practical matter, allowed to store in perpetuity on State lands." These materials include the cuttings from the bore hole drillings and "hundreds of thousands of pounds of drilling muds generated in the drilling process." Nunamta claims that "there is no way to return the land to its previously undisturbed condition upon revocation." Nunamta argues that if PLP had applied for permission to operate a landfill to bury "this quantity of concrete, steel, mud, cuttings and debris on state land" Article VIII would clearly demand "more than the closed-door issuance of a 'temporary' permit."

By contrast, the State characterizes the second *Wilderness Society* test as the "government use test." The State argues that this test is satisfied as long as "the structures which the licensee proposes to erect are capable of being removed," and "upon revocation the land may be left in suitable condition for Government use."[74] The State disagrees with Nunamta that the plugs and casings left underground in the drill holes are structures under this test, arguing that they do not affect the character of the land or leave it unsuitable for any use. The State also notes that the plugs and casings protect against environmental damage and views the second test as requiring "dramatic and long-standing intentional transformation of the landscape," arguing that no such transformation was contemplated by the permits here involved.

We agree with Nunamta that the bore holes plugged with concrete and encased by steel are installed structures for the purposes of the second *Wilderness Society* test. These columns will remain in the land. They are not in a practical sense capable of being removed, and it is undisputed that removing them would increase the potential for environmental harm. In our view the buried sumps containing drilling mud and other

---

[74] The State quotes *Wilderness Society v. Morton*, 479 F.2d 842, 872 (D.C. Cir. 1973) (en banc), for this premise.

drilling wastes should also be considered under the second test. The waste disposal sumps are not structures, but they are lasting alterations to the land. The landfill analogy used by Nunamta seems apt, for the sumps, like landfills, are used to dispose of potentially toxic material. The sumps of course could be dug up and the waste material removed, but only at great cost. The record does not reflect whether this would create additional environmental risks, but it seems clear that this will never occur.

The State's characterization of the second test as "the government use test" is flawed. The State focuses only on the final part of the test and ignores the question of whether installed structures can be removed.[75] In the expression of this test, the question of suitability for government use is not reached unless the proposed structures are capable of being removed. The *Wilderness Society* court found that the second test was best represented by the Attorney General's opinion concerning a proposal to grant a revocable permit to a railroad to lay tracks across a military reservation. This opinion stated, as quoted in *Wilderness Society*:

> If the permit is revocable at will by its terms, and if the structures which the licensee proposes to erect are capable of being removed in case of revocation, *and* if upon revocation the land may be left in suitable condition for government use, the fact that the licensee expects that the United States may not soon find it to its interest to revoke the license has no real bearing on the legal situation.[76]

Thus, under the test, where the structures are *not* capable of being removed, the question of suitability for government use does not arise.

---

[75] The superior court likewise did not consider removal of the materials used to plug the boreholes. In its findings, it said that "everything at the site, except for the bore hole drill casings and the material used to plug the holes, can be removed within a matter of weeks."

[76] *Wilderness Soc'y*, 479 F.2d at 872 (emphasis added).

This reading of the test thus emphasizes the importance of the continuing physical presence on the land of the structures constructed by the licensee. But it would be overly literal to suggest that where the structures cannot, or will not, be removed, their impact, or lack of impact, is irrelevant. In *Northern Alaska* we stated that the second *Wilderness Society* test required an analysis of "the long-term and harmful character of the environmental impact" resulting from the licensee's activities.[77] In applying this test in *Northern Alaska* we noted that the project there presented "the likelihood of irreversible ecological changes."[78] But we also used terms that encompassed less certain potential harms. We cited research that indicated that "vegetative clearing *may* result in the permanent thermal degradation of the sensitive Tanana Flats permafrost."[79] And in our conclusion, we referred to "*potential* long-term environmental damage"[80] as supporting our finding of functional irrevocability.

On the record of the present case it cannot be said that PLP's exploration activities will likely cause irreversible ecological changes.[81] However, there is the potential for environmental damage primarily through pollution of groundwater by the toxic waste that has been disposed of on the land and by acid rock drainage. In our view, this potential plus the continuing physical presence of the hundreds of concrete and steel

---

[77]     *N. Alaska Envtl. Ctr.*, 2 P.3d at 638.

[78]     *Id.* at 639.

[79]     *Id*. (emphasis added).

[80]     *Id.* (emphasis added).

[81]     *See supra* pp. 15-17.

encased bore holes suffice to justify a conclusion that the second *Wilderness Society* test also points toward functional irrevocability.[82]

We conclude that the MLUPs are not functionally revocable in light of the investment in prior exploration activities that would be lost if they were revoked, and the strong reasons the State has for not pretermitting the Pebble exploration process. We also believe that the concrete plugs and steel casings in the bore holes represent a lasting occupancy of state lands that is inconsistent with the concept of revocability. Further, the hundreds of sumps containing toxic waste and chemically reactive material represent a continuing potential source of environmental harm that is also inconsistent with the concept of revocability.

D.    **The TWUPs Are Not Disposals Of An Interest In Land**.

In the case of TWUPs, DNR did not issue just one permit for a given exploratory period. Rather, it issued PLP nine TWUPs in January 2007, and two additional TWUPs in May 2009. Most of the TWUPs each covered five separate water sources. Overall the nine 2007 TWUPs permitted taking water from 21 stream sources,

---

[82]    The two *Wilderness Society* tests are independent, and as used in that case, either would suffice to show functional irrevocability. In *Northern Alaska* we held that revocability should be assessed "under a hybrid approach" using both tests as factors for analysis. But we did not state that both tests must be satisfied for functional irrevocability to be found. Logically that should not be necessary. While the tests will often be complementary, a compelling case for functional irrevocability may be made when only one test is satisfied. For example, to draw on a case relied on by *Wilderness Society*, a chapel built on government land under a revocable permit could be removed without environmental damage but the loss of the licensee's investment would deter revocation to such an extent that the permit should be considered functionally irrevocable. In such a case, as the Attorney General stated in the *West Point Chapel* case on which *Wilderness Society* relied: "[T]he government would find itself embarrassed either to endure a perpetuity of right in the license or exercise an invidious power." *Wilderness Soc'y*, 479 F.2d at 871 (quoting Erection of Catholic Chapel at West Point, 21 Op. Att'y Gen. 537 (1897)).

18 pond sources, and five bore holes. Each TWUP covered a five-year period. The revocation clause in each TWUP provided: "Pursuant to 11 AAC 93.210(b), authorized temporary water use is subject to amendment, modification, or revocation by the Department of Natural Resources if the Department of Natural Resources determines that amendment, modification or revocation is necessary to supply water to lawful appropriators of record or to protect the public interest." Because this language is similar to the "at will" clause in the regulations governing MLUPs, we assume that this language qualifies as an at will revocation clause.[83] The TWUPs are specifically ancillary to the exploration project; they specify that the water will be used in support of exploration drilling operations.

Any particular TWUP could be revoked for a number of reasons that would not threaten PLP's overall exploration program. Thus a land manager would not inevitably feel pressured not to revoke a TWUP by the possibility of imposing an enormous financial loss on PLP or by the possibility of causing the loss of hundreds of jobs or threatening the State's credibility with potential mining investors. Further, unlike in the case of MLUPs, there are no permanent structures or other features left in or on the land with respect to the water use permits. For these reasons, we conclude that the TWUPs do not meet the *Wilderness Society* tests for functional irrevocability.

## V.   CONCLUSION

We have held that the judgment should be reversed because the MLUPs are disposals of an interest in land requiring prior public notice. On remand, therefore, the superior court should enter a declaratory judgment reflecting this view. We leave to the superior court the question of whether any other action is appropriate.

---

[83]   *See* 11 AAC 96.040(a) (2014), set out *supra* p. 30.

The judgment of the superior court is REVERSED and this case is REMANDED for entry of a declaratory judgment in accordance with this opinion and for such further action as may be appropriate.

WINFREE, Justice, concurring.

I agree with the court's conclusion that the facially short-term and revocable land use permits issued by the State of Alaska, Department of Natural Resources (DNR) to Pebble Limited Partnership (Pebble) are disposals of land requiring public notice under article VIII, section 10 of the Alaska Constitution. But reaching that conclusion by analyzing whether facially short-term and revocable permits are, functionally, long term and irrevocable seems ill-founded and far more complicated than necessary.[1] This analysis seems likely to lead to extensive litigation over mineral exploration permits, as was the case here, despite the court's suggestion that the analysis generally should be amenable to summary resolution. It is difficult to see how an as-applied challenge to the constitutionality of the State's issuance of a mineral exploration permit can be resolved in summary fashion.

A simpler analysis can be accomplished without relying on the permit's facial or functional temporal quality or revocability, or on the necessarily arbitrary

---

[1]    The court relies on the functional irrevocability tests adopted in *Northern Alaska Environmental Center v. State, Department of Natural Resources*; in that case we concluded a statutory best interest finding was required because the permit at issue was functionally irrevocable. 2 P.3d 629, 637-39 (Alaska 2000). When adopting the tests in *Northern Alaska* we relied on a federal case, *Wilderness Society v. Morton*, where the D.C. Circuit concluded that a special land use permit issued in relation to Trans-Alaska Pipeline construction was long term and functionally irrevocable. 479 F.2d 842, 870-75 (D.C. Cir. 1973). In *Northern Alaska*, noting the "broad constitutional mandate to protect the public interest in dispositions of state land" and applying rules of statutory interpretation, we were able to determine that a permit was a disposal of an interest in land before addressing functional irrevocability. 2 P.3d at 634-37 (construing interest in land to include permits and licenses and construing disposals to include "property interests of limited duration"). We adopted and applied the functional irrevocability tests only because we were faced with the assertion that the permit qualified for an exception to the best interest finding required under the Alaska Land Act. *Id.* at 637-39; *see* AS 38.05.035(e)(6)(C) (exempting "a permit or other authorization revocable by the commissioner" from written best interest finding requirement).

conclusion that a particular mining project has become such an unstoppable financial engine it likely would overcome the will of State employees charged with determining whether issuing or revoking a permit is in the State's best interest. This analysis relies on a mineral exploration permit's appurtenance to an existing mining claim, a property interest acquired from the State through article VIII, section 11 of the Alaska Constitution:

> Discovery and appropriation shall be the basis for establishing a right in those minerals reserved to the State . . . . Prior discovery, location, and filing, as prescribed by law, shall establish a prior right to these minerals and also a prior right to permits, leases, and transferable licenses for their extraction. Continuation of these rights shall depend upon the performance of annual labor, or the payment of fees, rents, or royalties, or upon other requirements as may be prescribed by law. Surface uses of land by a mineral claimant shall be limited to those necessary for the extraction or basic processing of the mineral deposits, or for both.

Alaska Statute 38.05.195(a) further explains that "[r]ights to deposits of minerals . . . in or on state land that is open to claim staking may be acquired by discovery, location, and recording . . . . The locator has the exclusive right of possession and extraction of the minerals . . . lying within the boundaries of the claim."[2] The locator also has the right to "use the surface of the location only to the extent necessary for the prospecting for, extraction of, or basic processing of mineral deposits."[3] A mining claim is a property interest in State land, although it does not include an absolute right to

---

[2]     *See also Welcome v. Jennings*, 780 P.2d 1039, 1042 (Alaska 1989) ("A person acquires the exclusive right to possess and extract minerals on state land by discovery, location, and recording."); *id.* ("Possession of a mining claim is evidenced by satisfying statutory requirements regarding location and performance of annual assessment work.").

[3]     11 Alaska Administrative Code (AAC) 86.145(a)(1) (2014).

explore for or mine minerals; a claim is contingent on DNR's "permission to mine."[4] But a mining claim holder has the right to use the claim's surface estate[5] and may preclude concurrent use of that surface estate, subject to DNR's authority to issue the concurrent user a land use permit or other written authorization.[6] A mining claim owner must, however, perform annual labor,[7] pay annual rent,[8] and obtain a permit before engaging in intensive mineral exploration.[9]

A mining claim owner's permit application must include a detailed "map at a sufficient scale showing the general location of all activities and routes of travel of

---

[4]    *See Beluga Mining Co. v. State, Dep't of Natural Res.*, 973 P.2d 570, 575-76 (Alaska 1999) (explaining company "had property rights in its claims, but it had no right to mine; its mining 'rights' were prospective and contingent").

[5]    *See Gold Dust Mines, Inc. v. Little Squaw Gold Mining Co.*, 299 P.3d 148, 165 (Alaska 2012) ("Under Alaska law, a person who acquires mining rights to located claims also has rights to make use of the corresponding surface estate . . . .").

[6]    *See* 11 AAC 96.010(a)(3) ("On state land, a permit or other written authorization is required for . . . an activity on land subject to a mineral or land estate property interest by a person other than the holder of a property interest . . . if the parties cannot agree on what constitutes reasonable concurrent use."); *cf. Shope v. Sims*, 658 P.2d 1336, 1339 (Alaska 1983) (stating possessor of mining claim has equitable claim for quiet title and may have legal claim for ejectment "against anyone who enters on it").

[7]    *See* AS 38.05.210(a) ("Labor shall be performed or improvements made annually on or for the benefit or development of each mining claim, leasehold location, and mining lease on state land except that, where adjacent claims, leasehold locations, or mining leases are held in common, the expenditure may be made on any one claim, leasehold location, or mining lease.").

[8]    *See* AS 38.05.211(a) ("The holder of each mining claim, leasehold location, prospecting site, and mining lease, . . . shall pay, in advance, rental for the right to continue to hold the mining claim, leasehold location, prospecting site, and mining lease . . . .").

[9]    *See* 11 AAC 96.010, .020.

all equipment" as well as "a description of the proposed activity, any associated structures, and the type of equipment that will be used."[10]  If DNR issues a permit it "is revocable for cause for a violation of a permit provision . . . and is revocable at will if [DNR] determines that revocation is in the state's interest."[11]  A claim owner, among others, has the right to appeal DNR's decision to issue, deny, or revoke a permit.[12]

We have not had much occasion to consider the tension between (1) a mining claim holder's mineral property rights and associated right to use the surface estate, and (2) the State's regulatory restrictions on the mining claim holder's ability to use the surface estate for exploration and development.[13]  I am not suggesting that a

---

[10]     11 AAC 96.030(a).

[11]     11 AAC 96.040(a).  It is not clear to me that we have considered the meaning of "at will" outside the employment context.  *See, e.g.*, *Pitka v. Interior Reg'l Hous. Auth.*, 54 P.3d 785, 789 (Alaska 2002) ("At-will employees may be terminated for any reason that does not violate the implied covenant of good faith and fair dealing. . . . Breach of the implied covenant may be either subjective or objective. . . . Disparate employee treatment, terminations on unconstitutional grounds, and firings that violate public policy are examples of actions that may violate the objective aspect of the implied covenant." (footnotes omitted)).  Black's Law Dictionary defines "at will" as "Subject to one's discretion; as one wishes or chooses; esp. (of a legal relationship), able to be terminated . . . by either party without cause[.]"  BLACK'S LAW DICTIONARY 149 (9th ed. 2009).

[12]     *See* 11 AAC 96.110 ("An eligible person affected by a decision issued under this chapter may appeal that decision in accordance with 11 AAC .02.").  Neither the relevant statutes nor regulations expressly set out the State's required considerations when issuing a mineral exploration permit.  But if a permit may be revoked "at will" when DNR determines it is in the State's best interest, then presumably a permit will be issued only if DNR determines it is in the State's best interest.

[13]     *Cf. Beluga Mining Co. v. State, Dep't of Natural Res.*, 973 P.2d 570, 574-76 (Alaska 1999) (holding that injunction delaying claim holder's ability to receive permits was not a taking because the company had no right to mine; rather, claim

(continued...)

-53-                                                                                                  **7011**

mining claim holder has a property interest in an exploration permit or that DNR must issue an exploration permit in every situation, but it does seem to me that if: (1) a mining claim holder has a constitutionally created property interest that can be explored and developed only by using the State's land surface; (2) the mining claim holder has a preferential right to reasonable use of the State's land surface; (3) the mining claim holder requests a permit for intensive use of the land surface to explore and develop its mineral property; and (4) DNR determines that it is in the State's best interest to allow intensive use of the State's land surface for this purpose in an appropriate manner, then the permit for the surface land use is effectively a disposal of a State land interest requiring public notice under the Alaska Constitution.[14]

---

[13](...continued)
holder's property interest was in the underlying claims).

[14]    Intensive use of State land surface for mineral exploration and development exceeds use allowed without a permit. *See* 11 AAC 96.020 (enumerating low-intensity uses, including prospecting and mining without heavy machinery, allowed on State land without permit); *Alyeska Ski Corp. v. Holdsworth*, 426 P.2d 1006, 1011 (Alaska 1967) (explaining that article VIII, section 10 of the Alaska Constitution "reflects the framers' recognition of the importance of our land resources and of the concomitant necessity for observance of legal safeguards in the disposal or leasing of state lands"). But under virtually any standard, the permit here allowed intensive use of State land surface through drilling and removal of core samples, seismic explosions, and waste disposal (in drill casings, enclosed drilling waste, and separate waste pits).